IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


MARLON DEON HARMON,                    )
                                       )
            Petitioner,                )
                                       )
vs.                                    )          Case No. CIV-13-80-M
                                       )
TERRY ROYAL, Warden,                   )
      Oklahoma State Penitentiary,     )
                                       )
            Respondent.[1]             )


## MEMORANDUM OPINION

Petitioner, Marlon Deon Harmon, a state court prisoner, has filed a Petition for

Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 27. Petitioner,

who is represented by counsel, is challenging the conviction entered against him in

Oklahoma County District Court Case No. CF-2004-4956. Tried by a jury in 2008,

Petitioner was found guilty of First Degree Felony Murder and was sentenced to death

based on the jury's finding of three aggravating circumstances: (1) the murder was

especially heinous, atrocious, or cruel; (2) Petitioner committed the murder while serving

a sentence of imprisonment for conviction of a felony; and (3) the existence of a

probability that Petitioner will commit criminal acts of violence that would constitute a

continuing threat to society (O.R. I, 106, 121-22; O.R. VI, 1193; O.R. VII, 1216-17).

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Terry Royal, who currently serves as warden of the
Oklahoma State Penitentiary, is hereby substituted as the proper party respondent.

Petitioner has presented twelve grounds for relief. Respondent has responded to the petition and Petitioner has replied. Docs. 35 and 46. Supplemental pleadings have also been filed. Docs. 50 and 53. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 29 and 37. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth herein, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. Harmon v. State, 248 P.3d 918 (Okla. Crim. App. 2011), cert. denied, 132 S. Ct. 338 (2011). Petitioner filed two applications for post-conviction relief. Both were denied. Harmon v. State, No. PCD-2014-71 (Okla. Crim. App. Feb. 13, 2014) (unpublished); Harmon v. State, No. PCD-2008-919 (Okla. Crim. App. Jan. 4, 2013) (unpublished).

## II. Facts.

Kamal Choudhury and his wife were owners of an Oklahoma City neighborhood convenience store, Q & S Food (Tr. III, 106-07). Around 7:45 p.m. on August 17, 2004, the police called Manshana Choudhury to tell her that the store had been robbed and that her husband was in the hospital. Mr. Choudhury died early the next morning (Tr. III, 108, 112-13). Mrs. Choudhury testified that her husband carried a wallet and that it was her impression that the wallet was

taken during the robbery. Among the items Mr. Choudhury kept in his wallet were his credit cards and his Sam's Club card. Mrs. Choudhury told the jury that after her husband's death, she learned that his credit cards had been used (Tr. III, 113-17).

Lance Nicholas, who lived in the neighborhood where Q & S Food was located, was headed to the store to use a pay phone when he first saw a little girl on a bicycle and then saw Mr. Choudhury come out of the store and fall to the ground. The little girl, later identified as Toni Ashley, was in shock. Mr. Choudhury, whose pants were so red that Mr. Nicholas thought he had been painting, asked Mr. Nicholas for help. Mr. Nicholas called 911. On the 911 call, which was admitted into evidence and played for the jury, Mr. Choudhury can be heard moaning in pain. When Mr. Nicholas asked Mr. Choudhury what the suspect looked like, Mr. Choudhury pointed at him and said, "Like you. Black." Mr. Nicholas was wearing a baseball hat backwards at the time (Tr. III, 146-51, 154; State's Ex. 46).

Ms. Ashley, who was only twelve years old at the time the crime was committed, was riding her bike when she saw a man run out of the Q & S store. The man had a gun in one hand and money in the other (Tr. III, 156-63). She described him as dark-skinned, 5'8" to 5'9" tall, and wearing a white t-shirt, dark blue jeans, and a black or blue do-rag (Tr. III, 172-76; State's Ex. 55). When

Ms. Ashley went to open the door to the store, Mr. Choudhury walked out and fell to the ground. Ms. Ashley tried to use a pay phone to call 911 as Mr. Choudhury asked her to, but when the phone would not work, she ran to her house to tell her mother (Tr. III, 163-70).

When Ms. Ashley initially failed to identify Petitioner at trial, the prosecutor asked her about her identification of Petitioner after the robbery. Ms. Ashley told the jury about seeing Petitioner's picture on the news. Petitioner's picture was one of three which appeared on the screen. The other pictures were of another male, Christopher Lancaster, and a female, Jasmine Battle.[2] From the screen shot, Ms. Ashley identified Petitioner as the man she saw running from the store. She testified that she was positive it was him (Tr. III, 176-80; State's Ex. 18). Then on redirect, Ms. Ashley admitted that her fear of Petitioner caused her to be untruthful in her ability to initially identify Petitioner in the courtroom. She subsequently made an in-court identification of him (Tr. III, 191-93).

Initial responders rendered aid to Mr. Choudhury and secured the crime scene. Mr. Choudhury was conscious and able to respond to questions. He had a wound to his abdomen and blood coming from two wounds to his upper leg. He was moaning, gurgling, and gasping for breath (Tr. III, 126-31, 133-36; Tr. IV, 26-32). The medical examiner confirmed that Mr. Choudhury was shot three times,

---

[2] Mr. Lancaster was Ms. Battle's boyfriend (Tr. IV, 180).

once in the stomach and twice in his right thigh (Tr. IV, 8-10; State's Ex. 32). The shot to the abdomen damaged his liver, causing internal bleeding and ultimately his death (Tr. IV, 11-13, 15, 21-22).

Ms. Battle, Petitioner's co-defendant, testified against him at trial.[3] On the day of the robbery, Ms. Battle was at Mr. Lancaster's mother's house when Petitioner came asking her for help to rob Mr. Choudhury's store, which was just a few blocks away. Petitioner was driving his girlfriend's green Honda Accord (Tr. IV, 181-86).[4] Ms. Battle got into the car with Petitioner and they headed straight to the store. Ms. Battle knew that Petitioner had a gun. She described Petitioner as wearing dark shorts, a shirt with cut-off sleeves, and a beanie cap. When Petitioner got out of the car, Ms. Battle moved into the driver's seat and circled the block a few times. She saw Petitioner enter the store and heard three gunshots (Tr. IV, 185-90). Because Ms. Battle had just made a pass by the store, Petitioner ran to catch up with her when he exited the store. The car did not stop, but only slowed as Petitioner entered the passenger side. Ms. Battle saw blood on Petitioner's hands. Although Petitioner told Ms. Battle to drive to his

---

[3] When Ms. Battle was first questioned by police, she did not cooperate. After Petitioner was brought in to see her and told her that the police already knew everything that happened, she decided to talk (Tr. IV, 212-17; State's Ex. 30). See Ground Two, infra.

[4] Petitioner's girlfriend, Devonna Bolden, confirmed that Petitioner was driving her green Honda Accord that day. Ms. Bolden testified that Petitioner dropped her off at her grandmother's house, used the car to run an errand, and then picked her up later. Although Ms. Bolden did not give exact times, she testified that "[i]t was just starting to get dark" when Petitioner dropped her off and dark when he picked her up (Tr. IV, 69, 71-76).

home, she got nervous from seeing the blood and refused. She exited the car and did not see Petitioner again that day (Tr. IV, 190-96).

Four neighbors testified about seeing Petitioner and Ms. Battle at the time of the robbery. Mary Morrow testified that she saw a black man walking down the street toward the store. She said that the only reason she noticed him was because he appeared nervous as he looked from side to side and all around. When she later heard about the robbery on the news, she called 911. She told the police that the man was in his 20's, 5'10" to 6' tall, thin, and wearing a head scarf or do-rag (possibly white), a white t-shirt with a black tank over it, black long/baggie shorts (possibly denim), and tennis shoes (Tr. III, 199-203). Matt Greenhaw, who lived across the street from Ms. Morrow, testified that he saw a young black man run down the street and get into the passenger side of a rolling green Honda Accord. He said the man was around 5'10" and 180 pounds, wearing a black and white shirt, black baggie long shorts (possibly denim), white tennis shoes, and a black do-rag. Mr. Greenhaw testified that he had seen this same man ten minutes or so earlier. At that time, the man had been walking down the street in the opposite direction (Tr. III, 211-22).

Sandra Cox and Jarid Frazier lived on the same street as Ms. Morrow and Mr. Greenhaw. Ms. Cox had gone to her front porch to smoke a cigarette when she saw a green Honda in front of her house. When she made eye contact with the

female driver, the car slowly proceeded away. About two houses down, she saw a young black man running around the corner. He got into the passenger side of the car. She described the man as wearing a white t-shirt, a black or blue jacket, blue jean shorts, white tennis shoes, and a black or blue do-rag (Tr. IV, 38-44). Mr. Frazier, Ms. Cox's fiancé, who had also gone to the porch to smoke a cigarette, gave similar testimony. He described the driver of the green Honda as a young black female and the man who jumped into the car as a young black man wearing a white t-shirt, black windbreaker with a hoodie, blue jean shorts, and tennis shoes. Mr. Frazier said the man was about 6' tall with an athletic build. Mr. Frazier did not think anything about what he saw until later when he learned about the robbery. He called Crime Stoppers to tell them what he had seen (Tr. IV, 50-63).

In processing the scene, the police found a large pool of blood on an elevated platform behind the checkout counter and a blood trail that led from behind the counter to the main part of the store. On the floor of the employee area, the police found three $20 bills, business cards, Mr. Choudhury's Sam's Club card, and other wallet items, although Mr. Choudhury's wallet was never found (Tr. IV, 106-10, 113-18, 124-27; Tr. V, 75; State's Exs. 8, 11-16, 31, 34-36, and 42). Petitioner's palm print was found on a scrap piece of paper among the items

discarded from Mr. Choudhury's wallet (Tr. IV, 122-27, 154-60; State's Exs. 42-44).[5]

Mr. Choudhury's credit cards were used sixteen times at ten locations immediately after the robbery and on the day following. The first credit card charge, which occurred within fifteen minutes of the robbery, was at a gas station across the street from Petitioner's apartment (Tr. IV, 70-71; Tr. V, 79-85, 100-01; State's Ex. 47). This coincided with Ms. Battle's testimony that Petitioner was headed to his house after the robbery and with Ms. Bolden's testimony that when Petitioner picked her up from her grandmother's house that night, Petitioner had changed clothes and filled up the car with gas (Tr. IV, 75-76, 79-81, 82-83). See n.4, supra.

Two additional charges were made in El Reno, one at 11:03 p.m. on the 17th and the other at 1:28 a.m. on the 18th (Tr. V, 87-89; State's Exs. 48 and 49). This coincided with Ms. Bolden's testimony that she and Petitioner had gone to a birthday party in El Reno after Petitioner picked her up from her grandmother's house and that while the party was going on, Petitioner put gas in two partygoers' cars and paid someone to braid Ms. Bolden's hair (Tr. IV, 76-77, 81-82; Tr. V, 4-7,

---

[5] Inside the store, police also found a fired bullet (Tr. IV, 113, 116-17, 144; State's Exs. 11, 40, and 54). This bullet and the one recovered during Mr. Choudhury's autopsy (Tr. IV, 13, 15-16, 17-18; State's Ex. 39) were both .38 caliber projectiles fired from the same gun. Although the weapon could not be positively identified, it was most probable that the weapon used was a .38 special or a .357 magnum which are typically revolvers (Tr. IV, 144-48). Because no spent casings were found at the scene, Mr. Choudhury was most likely shot with a revolver (Tr. IV, 133-36; Tr. V, 72-74, 97-99).

87, 101-02).[6]  The evidence also showed that Mr. Choudhury's credit card(s) had been used on the 18th at a Phillips 66 gas station in Chandler, Oklahoma. This station was about a block from Ms. Bolden's mother's house.  Petitioner was identified on the surveillance video, along with Ms. Bolden's green Honda Accord (Tr. IV, 85-94, 221-25; Tr. V, 86-87; State's Ex. 41).

Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

### III.  Standard of Review.

**A.      Exhaustion as a Preliminary Consideration.**

The exhaustion doctrine, a matter of comity which has long been a part of habeas corpus jurisprudence, requires the Court to consider in the first instance whether Petitioner has presented his grounds for relief to the OCCA.  As the Supreme Court stated in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  The exhaustion doctrine is set forth in 28 U.S.C. § 2254(b). Section 2254(b)(1)(A) prohibits the Court from *granting* habeas relief in the absence of exhaustion (although Section 2254(b)(1)(B) sets forth two limited exceptions to this rule), but  Section 2254(b)(2)  expressly  authorizes  the  Court  to  *deny*  habeas  relief "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

---

[6] Ms. Bolden testified that Petitioner did not have a job or any credit cards of his own (Tr. IV, 73, 84-85).

**B.     Procedural Bar.**

Beyond the issue of exhaustion, the Court must also examine how the OCCA adjudicated each of Petitioner's grounds for relief, i.e., whether the OCCA addressed the merits of Petitioner's grounds or declined to consider them based on a state procedural rule.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  Coleman, 501 U.S. at 729-30.

**C.     Limited Merits Review.**

When the OCCA has addressed the merits of one of Petitioner's grounds for relief, the Court reviews that ground in accordance with the standard of relief set forth in 28 U.S.C. § 2254(d).  Pursuant to that section of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order for Petitioner to obtain relief, he must show that the OCCA's adjudication of a claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that "[t]he petitioner carries the burden of proof"). The very focus of this statutory provision is the reasonableness of the OCCA's decision. "The question under AEDPA is not whether a federal court believes the [OCCA's] determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). In other words, "[i]t is not enough that [this] [C]ourt, in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous." What is required is a showing that the OCCA's decision is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court[,]'" and that "[i]f [it] is difficult to meet, that is because it was meant to be." White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted).

## IV. Analysis.

### A.    Ground One:        Ms. Battle's Plea Agreement.

Petitioner's first ground for relief concerns the State's plea agreement with his co-defendant, Ms. Battle. Petitioner asserts that the prosecution failed to disclose its entire agreement with her. He further asserts that when Ms. Battle failed to testify as to her entire agreement with the State, the prosecution had an obligation to correct her testimony. Relying on the Supreme Court's decisions in Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264 (1959), Petitioner asserts that he should be given a new trial.

The problem with Petitioner's Ground One is that he did not present it to the OCCA until his second post-conviction application, which was filed after he filed his petition in this case. The OCCA refused to address the merits of his Brady and Napue claims, finding that Petitioner had waived a merits review by failing to present them on direct appeal or in his first post-conviction application. Harmon, No. PCD-2014-71, slip op. at 3. Based on this ruling, Respondent has argued the affirmative defense of procedural bar. The parties have fully vetted the procedural bar issues in subsequent pleadings, addressing the issue of adequacy and whether Petitioner has shown cause and

prejudice to overcome the application of a procedural bar to these claims. However, rather than delve into the complex analysis of whether a procedural bar should be applied to Petitioner's Ground One, the Court chooses instead to take the simpler path and deny Petitioner relief on the merits. See Brown v. Sirmons, 515 F.3d 1072, 1092-93 (10th Cir. 2008) (quoting Snow v. Sirmons, 474 F.3d 693, 717 (10th Cir. 2007), and acknowledging that "the interest of efficiency" is served by this suggested approach); Snow, 474 F.3d at 717 ("We can avoid deciding procedural bar questions where claims can readily be dismissed on the merits."); Revilla v. Gibson, 283 F.3d 1203, 1210-11 (10th Cir. 2002) (acknowledging the Court's discretion to bypass the procedural bar question and reject the claim on the merits).

The record reflects that Ms. Battle was charged in two cases as a co-defendant with Petitioner, this murder case and a separate robbery case. Almost two years prior to testifying in Petitioner's murder case, Ms. Battle entered into a plea agreement with the State regarding the two cases. In exchange for truthfully testifying against Petitioner in both cases, Ms. Battle's murder charge was amended to accessory after the fact and she received a 20-year sentence, with all but the first seven years suspended. In the other case, she was also given a 20-year sentence, but with all but the first five years suspended. These sentences were ordered to run concurrently. Pet'r's Ex. 2. Three months after Ms. Battle testified in the murder case, she filed a post-conviction application seeking modification of her sentences. Pet'r's Ex. 3. In the State's response to this application, one of the prosecutors, Scott Rowland, acknowledged that in the months leading up to Petitioner's murder trial, "[t]he State, through the District

Attorney's Office, [had] agreed to take steps if lawfully available to cause the sentence to be modified" and he asked the trial court to modify Ms. Battle's sentences to ten years, "with all but the first five suspended and that the five years suspended portion be served without supervision." Pet'r's Ex. 6. The trial court granted Ms. Battle's application on October 27, 2008. Pet'r's Ex. 7.

Based on the prosecutor's representations in Ms. Battle's post-conviction case, Petitioner asserts that at the time Ms. Battle testified in May 2008, her plea deal had been enhanced. Because the State failed to disclose this more favorable agreement, Petitioner asserts that a <u>Brady</u> violation occurred. Petitioner argues that the materiality of the evidence is apparent: "the prosecution prevented [him] from arguing Battle was regurgitating evidence to curry favor and get the greatest benefit from her bargain." Pet. at 9. Petitioner further asserts that a <u>Napue</u> violation occurred when the prosecutor failed to correct Ms. Battle's false testimony. Because he "was prevented from exposing Battle's interest in testifying falsely," Petitioner argues that both the guilt and the sentencing stages were affected. <u>Id.</u> at 12.

In <u>Brady</u>, 373 U.S. at 87, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Favorable evidence includes impeachment evidence. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different.'" <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (quoting <u>Bagley</u>, 473 U.S. at 682).

Regarding false testimony, "the [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (footnotes omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." <u>Napue</u>, 360 U.S. at 269.

Given what the jury already knew about Ms. Battle's agreement with the State, the Court finds that even if the State had improved Ms. Battle's deal prior to trial and failed to disclose it,[7] the improved plea agreement was not material under <u>Brady</u>. Petitioner's <u>Napue</u> claim is also without merit. Because the record fails to show that Ms. Battle perjured herself, Petitioner has no claim for relief under <u>Napue</u>.

Beginning in voir dire, Petitioner's jury was advised that the State intended to present witnesses like Ms. Battle who had agreed to testify against Petitioner in exchange for lesser sentences (Tr. I, 198-99, 200-01, 230-31; Tr. II, 233). Then, on direct examination, Ms. Battle testified about her plea agreement as follows:

---

[7] Even though both of Petitioner's trial attorneys executed affidavits denying knowledge of any further deal with Ms. Battle (Pet'r's Exs. 15 and 16), on cross-examination defense counsel specifically asked Ms. Battle whether she hoped to have her sentence further reduced. Ms. Battle answered in the affirmative (Tr. IV, 227-28). Defense counsel does not state what prompted him to confidently pose this question.

Q       Did there come a time when you decided to become a witness for the State?

A       Yes.

Q       Did the District Attorney's Office offer you any leniency in return for testifying truthfully?

A       Yes.

Q       Do you remember who it was - - you had an attorney, I suppose?

A       Yes.

Q       Who was your lawyer?

A       Michael McBride.

Q       And did Michael McBride come to you at some point and tell you that he had worked out a plea agreement if you would testify truthfully?

A       Yes.

Q       What is that plea agreement?

A       A five and a seven and 15 on paper.

Q       A five and a seven and 15 on paper?

A       Yes.

. . . .

Q       Do you know whether or not as a part of your plea agreement - - do you know what you were originally charged with?

A       Yes.

Q       What was that?

A       Accessory to murder.

Q      Was that your original charge or is that what you were charged with in the end?

A      That's what I was charged with in the end.

Q      Was your original charge something different?

A      Yes.

Q      What was it?

A      First degree murder.

Q      So as part of your plea agreement it sounds like you got a reduced crime - -

A      Yes.

Q       - - and a number of years in prison?

A      Yes.

Q      And you are currently serving that term?

A      Yes.

(Tr. IV, 218-19, 220-21).  And on cross-examination, Ms. Battle further testified:

Q      Ms. Battle, I believe you said you were initially charged in this case with first degree murder, correct?

A      Yes, sir.

Q      And you agreed to enter into a plea agreement with the State; is that correct?

A      Yes, sir.

Q      And part of that agreement was that you would testify here today also, correct?

A      Yes, sir.

Q      And so you went from facing a long term of incarceration and possibly even a death sentence to a seven-year sentence in prison, correct?

A      Yes, sir.

Q      Isn't it true that you hope that after you testify in this case that you will further have your sentence reduced?

A      Can you repeat that, sir?

Q      **Isn't it your hope or belief that after you testify today that your sentence will be further reduced?**

A      **Yes, sir, I'm - - yes, sir.**

Q      You've gone over your testimony with the State, correct?

A      Excuse me?

Q      Have you spoken and gone over your testimony that you would - - the things that you would say today, you have talked about with the State, Mr. Rowland and Mr. Deutsch, correct?

A      Yes, sir.

Q      How many times?

A      A couple of times.

Q      And when you say a couple of times, do you mean two times?

A      Two times.

(Tr. IV, 227-28) (emphasis added).

Finally, in closing arguments, both the prosecutor and defense counsel discussed

Ms. Battle's plea with the jury. The prosecutor stated as follows:

She's in prison originally charged with murder. And the Judge explained to you that her trial is not before you at this time, but she told you that the State of Oklahoma amended her charges to accessory for helping him. She

is in prison now for driving the car and helping him. She told you that. **She hopes to get a better sentence, she told you that. And we told you in voir dire, we asked you, you know, if people cooperate with the police and the Government sometimes they get sentence reductions. That's what she is hoping.**

(Tr. VI, 18) (emphasis added). And defense counsel made the following remarks:

> And, finally, Ladies and Gentlemen, Jasmine Battle. Again, motive to lie. Is she interested? She took a deal. She was charged with first degree murder. She took a deal. She went over and over her testimony with the State. She was polished. **Does she think that deal is going to get any better? You better believe it.**

(Tr. VI, 37-38) (emphasis added).

Based on the foregoing excerpts from the trial, it is clear that the jury was aware of Ms. Battle's circumstances and the benefit she received from testifying against Petitioner. Like Petitioner, she, too, faced a murder charge with a minimum sentence of life imprisonment. Instead, she received a twenty-year sentence, with seven years in prison and thirteen years on probation, a deal that required her to give truthful testimony. The jury knew this *and* they knew that Ms. Battle hoped to have her sentence further reduced. Thanks to defense counsel the jury was also made aware of the fact that the prosecutors had worked with Ms. Battle to polish her testimony.

This is not a situation where any notion of cooperation was denied, nor is it a situation where Ms. Battle's testimony was the sole evidence connecting Petitioner to the murder. Here, the jury knew that Ms. Battle was a State's witness who received a significant benefit for her testimony. Evidence that she received some additional benefit in the form of a sentence reduction–the greatest of which was a reduction of her prison time from seven years to five years–was not material. As the Tenth Circuit has

acknowledged, there is no <u>Brady</u> violation where the "undisclosed impeachment evidence . . . [is] cumulative of evidence of bias or partiality already presented 'and thus [could] have provided only marginal additional support for [the] defense.'" <u>Douglas v. Workman</u>, 560 F.3d 1156, 1174 (10th Cir. 2009) (quoting <u>United States v. Trujillo</u>, 136 F.3d 1388, 1394 (10th Cir. 1998)). In addition, while Ms. Battle's testimony was obviously incriminating to Petitioner, there was other evidence connecting him to the murder, including unchallenged forensic evidence, i.e., his palm print on a piece of paper found at the scene among discarded items believed to have been in the victim's wallet (Tr. IV, 123-27, 154-60; State's Exs. 12, 15-16, 31, and 42-44). Under these circumstances, the Court concludes that even if Petitioner had known that the prosecution intended to support Ms. Battle's request for a sentence reduction, Petitioner has not shown "a reasonable possibility that . . . the result of the proceeding would have been different." <u>Strickler</u>, 527 U.S. at 280 (internal quotation marks and citation omitted).

Petitioner has also not shown his entitlement to relief under <u>Napue</u>. "A <u>Napue</u> violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." <u>United States v. Garcia</u>, 793 F.3d 1194, 1207 (10th Cir. 2015). The testimony which Petitioner claims was false was Ms. Battle's statement that her plea agreement was "[a] five and a seven and 15 on paper" (Tr. IV, 218-19). Reviewed in context, however, the prosecutor's questions related to her original plea. Ms. Battle was asked what agreement her attorney was able to work out. Her answer to that question was truthful. Pet'r's Ex. 2. Moreover, looking to her testimony as a whole, Petitioner is hard pressed to argue that Ms. Battle

perjured herself when she gave accurate responses to the questions posed and did not shy away from admitting her hope of receiving a reduction in her sentence beyond her original plea agreement.

For the foregoing reasons, the Court concludes that no relief is warranted under Brady or Napue. Ground One is therefore denied.

### B. Ground Two: Petitioner's Statements to Ms. Battle.

In his second ground for relief, Petitioner complains about the admission of his statements to Ms. Battle at the police station. Petitioner raised this claim[8] on direct appeal and was denied relief. Harmon, 248 P.3d at 932-34. The question before this Court is whether Petitioner is entitled to relief under Brecht v. Abrahamson, 507 U.S. 619 (1993). For the following reasons, the Court concludes that he is not.

Petitioner's challenge to the admission of statements he made to Ms. Battle flows from the suppression of his confession. Prior to speaking with Ms. Battle, Petitioner was questioned by police in a neighboring interview room. Although Petitioner invoked his right to remain silent, the police continued questioning until he confessed. Following his confession, Petitioner was taken to the room where Ms. Battle was being held. The purpose of this interaction was to encourage Ms. Battle to cooperate. Petitioner told

---

[8] Ground Two is a challenge to the admission of both the videotaped conversation between Petitioner and Ms. Battle and Ms. Battle's testimony about the conversation. Although Respondent has argued that Petitioner's challenge to Ms. Battle's testimony is unexhausted, the Court finds that one cannot be considered without the other. Because Petitioner's comments on the videotape are extremely difficult to discern, Ms. Battle's testimony regarding the conversation was integral to the videotape's evidentiary value (Tr. IV, 216-17). For this reason, the Court addresses Petitioner's Ground Two in its entirety, and finding that no relief is warranted under Brecht, exhaustion is irrelevant. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Ms. Battle that the police knew everything. <u>Harmon</u>, 248 P.3d at 932. Because his confession was suppressed, Petitioner's argument is that his conversation with Ms. Battle should have been excluded as well.

Although the State confessed error on direct appeal,[9] the OCCA withheld judgment on whether these unusual circumstances resulted in a constitutional violation, electing instead to deny relief due to harmless error. <u>Id.</u> at 932-34. While Petitioner goes to great lengths to argue the unreasonableness of the OCCA's decision, he ultimately acknowledges that his ability to obtain relief hinges on this Court finding that the admission of his statements to Ms. Battle had a substantial and injurious effect on the jury's verdict.

In <u>Fry v. Pliler</u>, 551 U.S. 112, 116, 121-22 (2007), the Supreme Court held that when a habeas court reviews a constitutional violation for harmlessness, it applies "the more forgiving standard of review" set forth in <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946), and adopted in <u>Brecht</u>, 507 U.S. at 638. Under <u>Kotteakos</u>, 328 U.S. at 776, the test is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." The Supreme Court elaborated on the standard as follows:

> But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the

---

[9] Respondent makes no argument regarding the underlying constitutional issue here either, but instead addresses only the issue of harmless error.

error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Id. at 765. "By 'grave doubt' [the Supreme Court] mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 435 (1995) (referring to the term employed in Kotteakos) (parentheses omitted).

Because of the additional corroborated testimony Ms. Battle gave about the crime itself, the Court concludes that any error associated with the admission of evidence regarding Petitioner's conversation with Ms. Battle at the police station did not have a substantial and injurious effect on the jury's verdict. Ms. Battle was the getaway driver. She told the jury that immediately before the robbery, Petitioner had come to her and asked for her help. Petitioner was driving his girlfriend's green Honda (Tr. IV, 183-85). Ms. Battle agreed to help Petitioner rob the Q & S Food Store, which was only a few blocks away. Petitioner drove the car until he got out and went into the store. It was then that Ms. Battle took over, circling the block a couple of times while waiting for Petitioner to return (Tr. IV, 181-82, 185-86, 188-89). Ms. Battle testified that Petitioner had a gun and that he was wearing dark colored shorts, a shirt with the sleeves cut out, and a beanie cap (Tr. IV, 186-87). Ms. Battle testified that she heard three gunshots (Tr. IV, 189). When Petitioner returned to the car, he got in on the passenger side and instructed Ms. Battle to drive to his house. Seeing blood on Petitioner's hands, Ms. Battle got nervous, refused to continue driving, and got out of the car. Ms. Battle did not see Petitioner anymore that day (Tr. IV, 191-96).

As detailed in the Facts, supra, Ms. Battle's testimony was corroborated on several points, and adding to her significantly corroborated testimony was evidence of Petitioner's palm print at the scene of the crime.  Although the victim's wallet was never found, his credit cards were taken while other contents from his wallet were found scattered in an employee-only area of the store. Petitioner's palm print was on a piece of notebook paper found among these discarded wallet items (Tr. III, 113-14; Tr. IV, 106-08, 110, 113-14, 115-16, 123-27, 154-60; State's Exs. 12, 15-16, 31, and 42-44).  Given Ms. Battle's corroborated testimony and this undisputed forensic evidence, the Court is convinced that Petitioner is not entitled to relief on his Ground Two.  Any error associated with the admission of evidence regarding Petitioner's conversation with Ms. Battle did not have a substantial and injurious effect on the jury's verdict.[10]

### C. Ground Three:    Tyrone Boston's Testimony.

Petitioner's Ground Three is a challenge to the State's use of a 2004 videotaped interview of Tyrone Boston. On direct examination, Mr. Boston, who had thirteen or fourteen felony convictions and who was incarcerated at the time of his testimony, testified that he did not recall contacting the police department about information he had

---

[10] In his reply, Petitioner faults Respondent (and the OCCA) for not addressing the effect of the challenged evidence on the reliability of his sentence.  Reply at 7-8.  However, Petitioner did not make this argument on direct appeal, *Br. of Appellant* at 33-38, and in his petition, he does nothing more than throw in a few stray statements that the alleged error affected both stages of his trial.  Pet. at 24, 25.  With a footnote reference to a prosecutorial misconduct claim he raised in his first post-conviction application, Petitioner appears to suggest that a sentencing challenge has been exhausted.  Id. at 13 n.9.  However, the Court finds that Petitioner has not exhausted any such claim nor adequately raised the same in the petition.  Nevertheless, the Court finds that the challenged evidence had no greater force or effect in the second stage than the first, and therefore, the Court's harmless error analysis sufficiently disposes of Petitioner's additional request for sentencing relief.

about the robbery at the Q & S convenience store. Mr. Boston testified that he was a cocaine addict and there "[a]in't no telling what [he] did in 2004" (Tr. V, 10, 14-16, 53-54). Aware that Mr. Boston might be forgetful on the stand, the prosecution prepared video clips from his 2004 interview to jog his memory (Tr. IV, 209; Ct's Ex. 1).

After seeing the first clip in which he said Petitioner told him that "he had to plug one," Mr. Boston continued to deny knowledge of the statement. Because he "was facing a whole bunch of time [himself]," Mr. Boston testified that he had been "willing to give them whatever they would take" (Tr. V, 17-19). When Mr. Boston could not recall ever seeing Petitioner with a .357 pistol or a .38 pistol, he was shown a second clip in which he said that he had seen Petitioner with a .9 mm, a .357, and .38 stub. When asked if this clip jogged his memory, Mr. Boston testified that "it's possible that I said that" (Tr. V, 19-20). Although Mr. Boston was shown a third clip, the defense objected and the trial court admonished the jury to disregard it.[11] In that clip, Mr. Boston repeats the "plug one" statement and additionally states that he knows what "they" do. In clarifying this last statement, the interviewer asks Mr. Boston if he means that "they" pull robberies (Tr. V, 22-51). See Ground Four, infra.

Petitioner asserts that the video clips[12] were impermissibly used as substantive evidence, and he argues that their admission violated Oklahoma's evidence code,

---

[11] In fact, the actual admonishment given by the trial court told the jurors to disregard anything they may have heard on the video, not just this final challenged clip (Tr. V, 51). See Harmon, 248 P.3d at 935 & n.15. See Ground Four, infra.

[12] In addition to the clips, Petitioner references testimony given by Oklahoma City Police Detective Tom Wilson. He asserts that the prosecutor called Detective Wilson "to hammer . . .

deprived him of a fair trial and a reliable sentencing proceeding, and denied him the right to confront his accusers. Pet. at 28. As in Ground One, <u>supra</u>, the parties dispute whether all or a part of this ground for relief should be procedurally barred, and as in Ground One, the Court finds that the easier course is to deny Petitioner relief on the merits. The Court also finds that rather than analyze each of Petitioner's arguments as to why the video clips should not have been admitted, the simpler course is to deny relief under <u>Brecht</u>. Because Mr. Boston's testimony and the video clips of his 2004 interview did not have a substantial and injurious effect on the jury's verdicts, Petitioner is not entitled to relief on his Ground Three.

By his own admission, Mr. Boston was not a credible witness. He had double digit felony convictions, at least one of which involved dishonesty, and he unabashedly testified that when he spoke to the police in 2004, he would have told "them whatever they would take" to get a better deal (Tr. V, 18-19, 53-54). Under these circumstances, Mr. Boston's testimony carried little, if any, weight.

Moreover, looking to the substance of the evidence, the most damaging of which was the "plug one" statement, the Court is convinced that it did not have a substantial and injurious effect on the jury's guilty verdict. With Ms. Battle's corroborated testimony and Petitioner's palm print at the scene, any error related to Mr. Boston's testimony was clearly harmless. <u>See</u> Ground Two, <u>supra</u>. This applies to the sentencing stage as well.

---

home" Mr. Boston's "plug one" statement. Pet. at 27. A review of Detective Wilson's testimony, however, reveals that no reference was made to Mr. Boston's interview on direct examination. It was in fact defense counsel, who, on cross-examination, inquired about the detective's contact with Mr. Boston and the "plug one" statement (Tr. V, 91-93).

Although Petitioner asserts that without Mr. Boston's testimony the jury may have had residual doubt about whether he or Mr. Lancaster shot Mr. Choudhury, Reply at 12-13, the Court disagrees. All of the evidence pointed to a single male suspect–only one man was seen leaving the store after Mr. Choudhury was shot and only one man was seen immediately before and after the robbery with Ms. Battle. When Petitioner's print at the scene is considered in conjunction with this evidence, the overwhelming evidence was that the one man was Petitioner. <u>See</u> Ground Eleven, <u>infra</u>. Ground Three is denied.

### D.    Ground Four:    Other Crimes Evidence.

Related to his Ground Three, Petitioner raises another issue regarding the video clips played during Mr. Boston's testimony. As noted in Ground Three, in the third clip shown to Mr. Boston, Mr. Boston states that he knows what "they" do. In clarifying this last statement, the interviewer asks Mr. Boston if he means that "they" pull robberies. Although the trial court ultimately admonished the jury to disregard this evidence (Tr. V, 22-51; Court's Ex. 1), Petitioner argues that the admonishment did not cure the error and that the OCCA acted unreasonably in finding otherwise.[13] Since the OCCA addressed this claim on the merits, <u>Harmon</u>, 248 P.3d at 934-35, Petitioner may only obtain relief if he can show that all fairminded jurists would agree that the OCCA got it wrong. <u>Frost v. Pryor</u>, 749 F.3d 1212, 1225 (10th Cir. 2014) ("If . . . some fairminded jurists could possibly agree with the [OCCA's] decision, then it was not unreasonable and the writ

---

[13] In his proposition heading, Petitioner alleges that this error also affected the reliability of his sentencing proceeding. Pet. at 32. However, because Petitioner makes no further mention of the same, the Court finds that this aspect of his Ground Four has not been sufficiently raised and it is therefore denied on this basis.

should be denied."); Lockett v. Trammel [sic], 711 F.3d 1218, 1231 (10th Cir. 2013) ("We may reverse only if all fairminded jurists would agree that the state court got it wrong.") (internal quotations and citation omitted). Because he has not done so, relief must be denied.[14]

It is well-established that "[f]ederal habeas review is not available to correct state law evidentiary errors . . . ." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999). See also Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005) (quoting Smallwood); Spears v. Mullin, 343 F.3d 1215, 1225-26 (10th Cir. 2003) (same). Thus, when a habeas petitioner complains about the admission of evidence, inquiry is limited to the constitutional issue of whether a due process violation has occurred. The question is whether the admitted evidence rendered the petitioner's trial fundamentally unfair. Id. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (finding that the exclusion of critical evidence denied a defendant "a trial in accord with traditional and fundamental standards of due process"). Undefined by specific legal elements, this standard obliges the Court to "tread gingerly" and "exercise considerable self-restraint." Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks omitted) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)). No alleged evidentiary error shall be viewed in isolation, but instead considered in light of the entire proceeding. Harris v. Poppell, 411 F.3d 1189, 1197 (10th Cir. 2005) (discussing the application of a

_____

[14] Referencing his Ground Five, infra, Petitioner argues for de novo review based on his assertion that the OCCA decided this issue without the benefit of a complete record. Pet. at 34. As discussed in Ground Five, the record was not incomplete. Therefore, this is not a valid reason for departing from AEDPA review.

fundamental fairness review and quoting Duckett and Le v. Mullin, 311 F.3d 1002,

1013 (10th Cir. 2002)).

> In denying Petitioner relief, the OCCA found as follows:

> The prosecutor unintentionally failed to stop the tape before Boston's statement that someone, possibly [Petitioner], robbed stores. Defense counsel objected and moved for a mistrial because the district court had sustained a motion *in limine* to exclude evidence of other robberies in the first stage of trial. The district court held a hearing outside the presence of the jury to consider the error. The judge listened to the tape three or four times and still reported difficulty in determining whether Boston referred to a robbery or robberies, although the syntax indicated that Boston used the plural "robberies" rather than the singular "robbery." In an attempt to determine the proper remedy for the error, the district court asked each juror individually what he or she last heard on the tape. Five jurors indicated that they could not understand what was being said or could not remember what they had last heard. Of the rest, only Juror S.R. indicated that it was about Harmon and possibly others robbing stores. After listening to argument, the district court overruled the motion for mistrial and elected to admonish the jury. The court admonished the jury:

>> that anything that you thought you heard or may have heard on the video is not part of the record and is not to be included in any of your discussions or deliberations.

Harmon, 248 P.3d at 934-35 (footnote omitted). It then concluded that the trial court's

admonishment to the jury effectively cured the error. Id. at 935 ("We do not hesitate to

conclude that the district court's admonishment cured any error. . . . This inadvertent

evidence did not determine the result of [Petitioner's] trial.").

Petitioner makes two arguments in his effort to show that the OCCA's decision is

unreasonable. First, Petitioner takes issue with the OCCA's determination that the

evidence was introduced unintentionally. Because the prosecutor was responsible for

cueing up the clips, Petitioner argues that the prosecutor must have intended to play the

portion of the clip referencing other robberies or it would not have been played. Petitioner leaves no room for any explanation based on inadvertence or accident. Pet. at 34; Reply at 13. However, the trial record offers no support for Petitioner's position. The prosecutor apologized for his "absolutely inadvertent" mistake, and although defense counsel argued for a mistrial based on this mistake, neither defense counsel nor the trial court gave any indication of a belief that it was anything but inadvertent (Tr. V, 24-28).

Second, Petitioner claims the OCCA applied the wrong standard of review. He argues that the OCCA inappropriately looked to the remaining evidence to determine if Petitioner's guilt was otherwise established and he asserts that the standard that should have been applied was <u>Brecht's</u> substantial and injurious effect test. Pet. at 34. <u>Brecht</u> was clearly inapplicable to the OCCA's direct review of this claim. <u>See Lockett</u>, 711 F.3d at 1232 (acknowledging that <u>Brecht</u> applies to cases on collateral review). Moreover, the OCCA did not conduct a harmless error analysis, but assessed whether the admonishment given by the trial court was sufficient to cure the error. In so doing, it acknowledged "that an admonishment cures the error from improper testimony or an improper comment at trial, unless the improper testimony or comment was such that it appears to have determined the result of the defendant's trial." <u>Harmon</u>, 248 P.3d at 935 (internal quotation marks omitted) (citations omitted). This is not an unreasonable determination. <u>See United States v. Morgan</u>, 748 F.3d 1024, 1042 (10th Cir. 2014) ("The district court advised the jury to disregard the statement, and juries are presumed to follow curative instructions."); <u>Dotson v. Zenon</u>, 549 F.Supp.2d 1291, 1298 (D. Colo. 2008) ("[J]uries are presumed to follow instructions, absent proof to the contrary.");

<u>Sanchez v. Brokop</u>, 398 F.Supp.2d 1177, 1185 (D.N.M. 2005) ("It is presumed that juries follow the instructions they receive from the Court.").

Because Petitioner has not shown that the OCCA unreasonably denied him relief in violation of Section 2254(d), his request for relief from this Court must also be denied.

### E.    Ground Five:    Court's Exhibit 1.

Related to his Grounds Three and Four, Petitioner complains about Court's Exhibit 1, the DVD of the video clips played during Mr. Boston's testimony. Petitioner asserts that his constitutional rights have been violated because this exhibit was not initially included in the appeal record and because it contains more of Mr. Boston's interview than was actually played at trial. Although Respondent has argued for the application of a procedural bar to this claim, the claim is easily disposed of on the merits.

The record reflects that the DVD used during Mr. Boston's testimony was admitted as Court's Exhibit 1 (Tr. V, 50). The record also reflects that Court's Exhibit 1 was made a part of the appellate record. *Order Granting Supplementation of the Record and Directing Oklahoma County Court Clerk to Transmit Records*, Case Nos. PCD-2008-919 and D-2008-657 (Okla. Crim. App. Feb. 18, 2010). Although the DVD contains more of Mr. Boston's interview than was actually played for the jury at trial, when viewed in conjunction with the trial transcript, Petitioner's complaints regarding the prosecution's use of it at trial are easily understood and evaluated. It therefore follows that for the reasons set forth in Grounds Three and Four, <u>supra</u>, Petitioner is not entitled to relief on his DVD-related claims and with respect to this ground, he has not shown how the DVD in and of itself entitles him to the grant of habeas relief. <u>See</u> <u>Wilson v.</u>

Corcoran, 562 U.S. 1, 5 (2010) ("The habeas statute [28 U.S.C. § 2254(a)] unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'").  Ground Five is denied.

### F.    Ground Six:        Ms. Ashley's In-Court Identification.

In Ground Six, Petitioner challenges Ms. Ashley's in-court identification of him. Alleging that on September 24, 2004, the police utilized a suggestive procedure when they showed Ms. Ashley his picture as it appeared on a newscast following his arrest, Petitioner argues that Ms. Ashley's in-court identification of him was unreliable and should not have been permitted.  Although Petitioner challenged Ms. Ashley's in-court identification on direct appeal, Respondent asserts that Petitioner did not challenge the identification on the same basis as he does here.  Respondent is correct.  On direct appeal, Petitioner argued that the suggestive procedure was the actual newscast Ms. Ashley saw while at home on September 9, 2004.  *Br. of Appellant* at 44-46.  Because Petitioner's Ground Six has not been fairly presented to the OCCA for adjudication, it is unexhausted and subject to an anticipatory procedural bar.

In Simmons v. United States, 390 U.S. 377, 384 (1968), the Supreme Court held "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Therefore, to make a Simmons claim, a defendant must point to a suggestive identification procedure.  On direct appeal,

Petitioner claimed that the suggestive procedure was the September 9th newscast showing his picture, along with pictures of Mr. Lancaster and Ms. Battle (State's Ex. 55). This was the claim that the OCCA addressed. Harmon, 248 P.3d at 935-36. Here, however, Petitioner does not argue for Simmons relief based on the September 9th event, but instead claims that the suggestive identification procedure was the police showing her the newscast pictures some two weeks later.

In order to exhaust a claim, Petitioner must show that it was fairly presented to the OCCA. As the Tenth Circuit acknowledged in Williams v. Trammell, 782 F.3d 1184, 1210 (10th Cir. 2015),

> A party exhausts a claim in state court when it has been "fairly presented." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). "Fair presentation," in turn, requires that the petitioner raise in state court the "substance" of his federal claims. Id. at 278, 92 S.Ct. 509. This includes not only the constitutional guarantee at issue, but also the underlying facts that entitle a petitioner to relief. Gray [v. Netherland], 518 U.S. [152,] 163, 116 S.Ct. 2074 [(1996)]; see Fairchild v. Workman, 579 F.3d 1134, 1149 (10th Cir.2009) ("A claim is more than a mere theory on which a court could grant relief; a claim must have a factual basis, and an adjudication of that claim requires an evaluation of that factual basis.") (citation omitted).

Although Petitioner challenged Ms. Ashley's identification on direct appeal, he did not present the OCCA with the factual basis he now uses to support his claim. Accordingly, Petitioner's Ground Six is unexhausted.

In order to exhaust this claim, Petitioner would have to file a third post-conviction application, but because it is clear that the OCCA would apply a procedural bar to it, see Okla. Stat. tit. 22, § 1089(D)(8), an anticipatory procedural bar applies. See Cole v. Trammell, 755 F.3d 1142, 1169 (10th Cir. 2014) (citing Anderson v. Sirmons, 476 F.3d

1131, 1139-40 n.7 (10th Cir. 2007), and acknowledging the applicability of an anticipatory procedural bar).  Although Petitioner could overcome the application of a procedural bar to this claim by satisfying one of two exceptions, Frost, 749 F.3d at 1231, he has made no attempt to do so.  In the event this Court found the claim to be unexhausted, which it has, Petitioner requested a stay to permit exhaustion.  However, because the OCCA would procedurally bar the claim, exhaustion is futile and a stay is unwarranted.  Petitioner's Ground Six is procedurally barred.

### G.     Ground Seven:     Failure to Excuse a Juror for Cause.

In his seventh ground for relief, Petitioner asserts that the trial court violated his right to an impartial jury when it denied his request to excuse Juror Calhoun for cause. Petitioner raised this claim on direct appeal and was denied relief.  Harmon, 248 P.3d at 931-32; *Order Granting Reh'g but Denying Recall of the Mandate*, Case No. D-2008-657 (Okla. Crim. App. Mar,. 2, 2011).  Because Petitioner has not shown that the OCCA's denial is contrary to or an unreasonable application of Supreme Court law, relief must be denied.

"Capital defendants have the right to be sentenced by an impartial jury." Uttecht v. Brown, 551 U.S. 1, 22 (2007).  "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."  Morgan v. Illinois, 504 U.S. 719, 727 (1992).  An impartial juror in the capital setting is one who, despite his or her views on capital punishment, can follow the trial court's instructions. Thus, "the proper standard for determining when a

prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (citation omitted).

"[B]ecause determinations of juror bias cannot be reduced to question-and-answer sessions[,]" the printed record cannot fully capture the qualification assessment. Id. at 424-26, 434-35. Reviewing courts must therefore defer to the trial court's determination of whether a particular juror is qualified to serve. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht, 551 U.S. at 9. Adding to this deference is the AEDPA deference a federal habeas court must afford a state court decision under 28 U.S.C. § 2254(d), and in addition, because the state trial court's determination is a factual one, it is presumed correct under 28 U.S.C. § 2254(e)(1). Witt, 469 U.S. at 429; Johnson v. Gibson, 254 F.3d 1155, 1160 (10th Cir. 2001). Under these conditions, a habeas petitioner challenging juror cause determinations faces a high hurdle. See Eizember v. Trammell, 803 F.3d 1129, 1135-36 (10th Cir. 2015) (acknowledging that these claims are given "double deference").

Petitioner contends that Juror Calhoun should have been excused for cause based on the following exchange with defense counsel:

> [DEFENSE COUNSEL]: Do you think it's important to look at someone's background - -

PROSPECTIVE JUROR CALHOUN:     Yes.

[DEFENSE COUNSEL]:   - - prior to determining whether or not to execute them?

PROSPECTIVE JUROR CALHOUN:     No.

[DEFENSE COUNSEL]:   And why don't you feel that way?

PROSPECTIVE JUROR CALHOUN:   Because everyone has something in their background that is going on.  It doesn't mean that they are a murderer or something else, you know.

(Tr. II, 91).  Petitioner argues that this exchange shows that Juror Calhoun would not consider (or give meaningful consideration to) his background as mitigating evidence. Because he has a right to present mitigating evidence and have the jury consider the same, Petitioner argues that Juror Calhoun should have been excused for cause upon his request (Tr. II, 108-09).  Defense counsel did not use a peremptory challenge to excuse Juror Calhoun, nor did he request an additional peremptory challenge for that purpose (Tr. II, 119-20).

The OCCA initially denied Petitioner's claim because he failed to preserve it.  Harmon, 248 P.3d at 931-32.  On rehearing, however, the OCCA further addressed the claim as follows:

> The district court has broad discretion when considering a request to excuse a juror for cause.  Rojem v. State, 2009 OK CR 15, ¶ 3, 207 P.3d 385, 388. "A juror should be able to consider all penalties, and his or her views should not prevent or substantially impair the performance of his or her duties as a juror in accordance with her instruction and oath."  Id. [Juror Calhoun] indicated that she did not think it was important to know about a person's background before making a decision about the death penalty because "everyone had something in their background that is going on."  Never did [Juror Calhoun] state that she would not consider such evidence if instructed to do so.  [Juror Calhoun] consistently said she would

listen to the evidence and follow the law given to her by the court. The district court did not abuse its discretion in refusing to excuse [Juror Calhoun] for cause.

*Order Granting Reh'g but Denying Recall of the Mandate* at 1-2. This is a reasonable determination.

First, because no follow-up questions were asked,[15] it is not at all clear that Juror Calhoun's comment was a declaration that she would not consider Petitioner's background in her consideration of the mitigation case. Although defense counsel ultimately requested that she be removed for cause, even he acknowledged the possibility that she may have misunderstood his question. The trial court noted that possibility as well (Tr. II, 108). In light of this ambiguity, it was not unreasonable for the OCCA to conclude that this single comment did not make Juror Calhoun an unqualified juror. Second, Juror Calhoun's comment cannot be viewed in isolation. A juror's ability to serve impartially cannot be determined by a single question and answer. See Darden v. Wainwright, 477 U.S. 168, 176 (1986) ("[O]ur inquiry does not end with a mechanical recitation of a single question and answer."). In analyzing Petitioner's claim, the OCCA reviewed the entire voir dire of Juror Calhoun, concluding that she was one who would hear the presented evidence and follow the instructions given. The record supports this determination (Tr. II, 65-67, 72-75, 76).

---

[15] When asking other prospective jurors this same question, defense counsel used follow-up questions as necessary to fully evaluate the juror's qualification to serve (Tr. II, 86-87, 95, 99, 101, 104, 106, 106-107).

For the foregoing reasons, Petitioner has failed to show that the OCCA unreasonably denied him relief on his claim concerning Juror Calhoun. Ground Seven is therefore denied.

### H.     Ground Eight:     Voir Dire Limitations.

In Ground Eight, Petitioner asserts, as he did on direct appeal,[16] that his constitutional rights were violated by the trial court's curtailing of his questions to prospective jurors. The OCCA addressed the merits of this claim and denied relief. Harmon, 248 P.3d at 927-28. Because Petitioner has not shown that the OCCA's decision is unreasonable, relief is not warranted.

As discussed in Ground Seven, supra, Petitioner is entitled to an impartial jury. Part and parcel of this right is "an adequate *voir dire* to identify unqualified jurors." Morgan, 504 U.S. at 729; Wilson v. Sirmons, 536 F.3d 1064, 1098 (10th Cir. 2008). However, adequate does not mean unlimited or unrestricted. It is well-established that the trial court has "great latitude" and "considerable discretion" over the voir dire process. Sallahdin v. Gibson, 275 F.3d 1211, 1223 (10th Cir. 2002); Moore v. Gibson, 195 F.3d 1152, 1170 (10th Cir. 1999). Where, as here, Petitioner complains about restrictions placed on his inquiry, the question is one of fundamental fairness, i.e., whether the trial court's actions denied Petitioner a fundamentally fair trial. Mayes v.

---

[16] Although Respondent has argued that Petitioner's current claim is something more than what he raised on direct appeal (and is therefore subject to procedural default), Petitioner assures the Court in his reply that he is raising the same claim. Reply at 17. The Court accepts Petitioner's assurance. The Court will not, however, consider Petitioner's Exhibit 30 upon which he relies in part to support his request for relief. Because this evidence was not before the OCCA when it decided Petitioner's claim, Pinholster prohibits its consideration. Pinholster, 563 U.S. at 181.

Gibson, 210 F.3d 1284, 1292 (10th Cir. 2000); Moore, 195 F.3d at 1170; Neely v. Newton, 149 F.3d 1074, 1084 (10th Cir. 1998).

Consistent with the foregoing authority, the OCCA acknowledged the trial court's discretion in conducting voir dire, discretion which permits the "restrict[ion of] questions that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury." Harmon, 248 P.3d at 927. "'There is no abuse of discretion as long as the *voir dire* examination affords the defendant a jury free of outside influence, bias or personal interest.'" Id. (citation omitted). The OCCA then held as follows:

> The trial court excluded inquiry designed to elicit answers based on facts that were not before the jury or about matters on which the court would instruct. The record shows that defense counsel was permitted to question the potential jurors at length about their attitudes toward the death penalty, including questions such as: is life imprisonment without the possibility of parole a serious punishment; do you support the death penalty; do you consider yourself a strong or weak supporter of the death penalty; should the death penalty be reserved for only the worst cases; would you be open to hearing mitigating evidence; do you favor one punishment over another; is the decision whether to impose the death penalty a serious one; are there too many steps required to impose a death sentence; do you think this is a decision that will stay with you for years; and will you just pay lip service to considering all three punishments. The district court's limitations did not prevent defense counsel from fully exploring the potential jurors' views on the death penalty. The *voir dire* allowed was broad enough to enable defense counsel to challenge prospective jurors for cause and to intelligently exercise peremptory challenges.

Id. at 927-28 (footnote omitted).

A thorough review of voir dire leads the Court to conclude that the OCCA's determination is both reasonable and amply supported. The record shows that the questions posed by the trial court, the prosecutor, and defense counsel were sufficient to determine the prospective jurors' qualification for service, and Petitioner's reliance on

Juror Polk as support for the contrary is unavailing. As previously noted, see n.16, supra, the Court cannot consider Petitioner's Exhibit 30, Juror Polk's 2013 affidavit, because it was not before the OCCA when it decided this claim, and although Petitioner argues that even without the affidavit, "[t]he record of Polk's bias to always vote for the death penalty was before the OCCA[,]" Reply at 17, the record does support this assertion. While Juror Polk acknowledged that she was a strong supporter of the death penalty, she also stated that the death penalty was reserved for the worst of the worst and that she would listen to all of the evidence before determining an appropriate punishment (Tr. I, 184-86; Tr. II, 92-93). Ground Eight is denied.

## I.    Ground Nine:    Victim's Family.

In Ground Nine, Petitioner raises three claims based on his assertion that the victim's wife and son were not in favor of a death sentence. Petitioner argues that if the jury had heard that they favored a sentence less than death, he would have received a lesser sentence, and he faults the prosecution for not disclosing this information, the trial court for not recognizing the prosecution's duty to disclose it, and defense counsel for not discovering it on their own. Petitioner raised these claims in his first post-conviction application. The OCCA found the claims to be procedurally barred and the related appellate counsel ineffectiveness claim to be without merit. Harmon, No. PCD-2008-919, slip op. at 3, 13-19. Here again, this claim is most easily disposed of on the merits.

Petitioner's Ground Nine hinges on his assertion that the victim's family was in favor of a sentence less than death. However, Petitioner's only support for this assertion is an affidavit executed by an investigator. In the affidavit, the investigator states that he

met with the family twice in 2010 and that during their conversations, "both witnesses expressed an opinion that they were not in favor of the death penalty for [Petitioner]." *Original Appl. for Post-Conviction Relief* at Attach. 25. This is hearsay, which is inherently unreliable and inadmissible in this proceeding.

While the Court has the authority to consider affidavits pursuant to Rule 7(b) of the Rules Governing Section 2254 Cases in the United States District Courts, and where, as here, Pinholster does not preclude the Court's consideration of the investigator's affidavit, hearsay is still hearsay. Presenting hearsay in an affidavit does not change its character, and pursuant to Fed. R. Evid. 802, hearsay is inadmissible. See Lopez v. Miller, 915 F.Supp.2d 373, 423 (E.D.N.Y. 2013) ("The Federal Rules of Evidence apply in federal habeas proceedings."); Leyja v. Oklahoma, Case No. CIV-09-265-W, 2010 WL 1881462, at *12 n.60 (W.D. Okla. Apr. 7, 2010) (acknowledging the application of the federal rules of evidence and concluding that "hearsay in an affidavit cannot serve as a basis for habeas relief"). See also Neill v. Gibson, 278 F.3d 1044, 1056 (10th Cir. 2001) (finding no abuse of discretion in refusing to consider hearsay affidavits by investigators).

Petitioner attempts to get around his hearsay problem by (1) arguing that Respondent has not effectively challenged or rebutted the evidence and (2) asserting that the OCCA acknowledged the factual validity of this evidence. Reply at 18. Neither contention is persuasive. Respondent challenged the investigator's affidavit when it was first presented in Petitioner's state post-conviction application, he continues to do so here, and Petitioner has not shown that Respondent's failure to do more results in a default

finding of veracity. Harmon, No. PCD-2008-919, slip op. at 14; Resp. at 58 n.21. As for the OCCA's treatment of the evidence, Petitioner has not cited any particular language in the OCCA's opinion to support his contention that the OCCA made a factual conclusion with respect to the contents of the affidavit. And in fact, the Court notes that in discussing the affidavit, the OCCA was very careful to caveat its source. Harmon, No. PCD-2008-919, slip op. at 13-14 ("The investigator attested . . ."; According to the investigator . . ."; "The investigator believed . . ."; "The investigator further stated . . ."). Without the affidavit, Petitioner's Ground Nine lacks any evidentiary support and is hereby denied on that basis.

### J.     Ground Ten:     Prosecutorial Misconduct.

In his tenth ground for relief, Petitioner alleges that both stages of his trial were affected by the prosecution's improper actions. Petitioner presented claims of prosecutorial misconduct to the OCCA in his direct appeal and in his first application for post-conviction relief. For the following reasons, none of these claims warrant habeas relief.

"Prosecutors are prohibited from violating fundamental principles of fairness, which are basic requirements of Due Process." Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015). Therefore, when a petitioner alleges prosecutorial misconduct, the question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Evaluating the alleged misconduct in light of the entire proceeding, the reviewing court must determine "whether the jury was able to

fairly judge the evidence in light of the prosecutors' conduct."   Bland v. Sirmons,

459 F.3d 999, 1024 (10th Cir. 2006).

### Claims Raised on Direct Appeal

In the second closing argument of the first stage, the prosecutor discussed

Ms. Ashley's testimony and her failure to initially identify Petitioner in court. The

prosecutor asserted that Ms. Ashley's testimony was affected by her fear of Petitioner,

and he reminded the jury that Ms. Ashley was only twelve at the time of the

murder (Tr. VI, 48-50).   In the course of this discussion, the prosecutor made the

following comment, which was not objected to at trial but alleged to be error on direct

appeal:

> Ladies and Gentlemen, to you and me the boogie man is a mythical
> creature, but to Toni Ashley the boogie man is the guy she saw running out
> of that store with a gun.  And her friends had been no help to her telling her
> the guy was going to come get her if she testified.

(Tr. VI, 49).  Petitioner asserts that the prosecutor's reference to him as "the boogie man"

was prejudicial name-calling which the OCCA has largely condemned.   Pet. at 66.

Petitioner additionally asserts that because the OCCA did not specifically address this

claim within its analysis, the Court should review the claim de novo and grant him relief

under the Brecht standard of review.  Id. at 72-73.

In denying Petitioner relief on this claim, the OCCA acknowledged that one of

Petitioner's complaints was that "the prosecutor engaged in name calling . . . in first-stage

closing argument."   Harmon, 248 P.3d at 943.  Because there was no objection to the

challenged comment, the OCCA stated that its review was limited to plain error.  Id.  The

OCCA then held as follows:

> Relief will be granted on a prosecutorial misconduct claim only where the misconduct effectively deprives the defendant of a fair trial or a fair and reliable sentencing proceeding. We evaluate alleged prosecutorial misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel.

> With two exceptions, we see nothing in any of the comments, individually or cumulatively, that exceeds the wide latitude parties have to discuss the evidence and reasonable inferences from the evidence.

Id. (quotation marks omitted) (citations omitted).

Contrary to Petitioner's argument, it is clear to the Court that the OCCA addressed

Petitioner's name-calling claim and found no error.  Thus, AEDPA deference is due, and

Petitioner can only obtain relief if he shows that the OCCA's determination is

unreasonable.  He cannot.  Ms. Ashley's fear of Petitioner was part of the presented

evidence (Tr. III, 159-60 162-63, 167, 177, 191-93), and it was therefore not

unreasonable for the OCCA to conclude that the prosecutor's comment in this context did

not deprive Petitioner of a fair trial.

On direct appeal, Petitioner also claimed that the prosecutor argued facts not in

evidence when he discussed with the jury how Petitioner may have carried out the murder

of Mr. Choudhury (Tr. VI, 51-52; Tr. VIII, 87-88). Petitioner contends that the

prosecutor's theory that he first shot Mr. Choudhury in the stomach from in front of the

counter and then came around to the back of the counter to shoot him twice in the leg was

"an execution-style" scenario unsupported by the evidence.  Pet. at 66-68.  Here again, Petitioner faults the OCCA for not specifically addressing this claim.  Id. at 72-73.

Like the name-calling claim, AEDPA deference applies because the OCCA specifically referenced and denied Petitioner's argument that the prosecutor argued facts not in evidence.  Harmon, 248 P.3d at 943.  And contrary to Petitioner's argument, the Court finds that the argument was permissible.  Within the argument itself, the prosecutor noted the evidence upon which his theory was based, and in addition, upon an objection by defense counsel, the trial court even reminded the jurors that the prosecutor's comments were persuasive only (Tr. VI, 51-52).  Under these circumstances, Petitioner has failed to show that the OCCA's decision is unreasonable.

The final claim from Petitioner's direct appeal concerns the prosecutors' comments during second stage closing argument regarding the jury's consideration of mitigation evidence.  Petitioner contends that the prosecutors' comments were highly improper and denigrated his second stage case.  Petitioner asserts that because he has a specific constitutional right to present mitigation evidence and because the prosecution interfered with this right, it was unreasonable for the OCCA to deny him relief on this claim.

In addressing this claim, the OCCA found that for the most part, the comments were not error.  In arriving at this decision, the OCCA found as follows:

> The prosecutor . . . did not urge the jury to categorically disregard the proffered mitigation evidence, but instead argued that the evidence offered in mitigation did not support an inference of reduced culpability. ("You know, you look at the mitigating evidence that they proffer. It's proper. You consider it."). The prosecutor went on to say that any mitigating

evidence did not outweigh the aggravating circumstances established by the State. In the end, the prosecutor invited jurors to consider all [Petitioner's] mitigating evidence, weigh it against the aggravating circumstances, and find that the death penalty was appropriate. The prosecutor's argument, while often pointed or skeptical, did not preclude the jury from considering all the mitigating evidence. [Petitioner's] jury was properly instructed on the definition of mitigating evidence, the evidence [Petitioner] presented, and the duties of a juror. For that reason, we find no error.

Harmon, 248 P.3d at 943-44 (citations omitted). The OCCA did, however, find that two of the prosecutor's comments "came very close to crossing the line of permissible argument." Id. at 944. The OCCA was "troubled by the prosecutor's argument that [Petitioner's] mitigation witnesses were put on as "human shields" and by his exhortation to the jury not to let anyone give them a "guilt trip" about doing their job." Id. It nevertheless denied relief, finding "that [none] of these comments, individually or cumulatively, contributed to [Petitioner's] death sentence. Id.

Although Petitioner presents arguments as to why the OCCA's determination of this claim was unreasonable, he also argues, as he did with his other direct appeal claims, that deference should not apply because the OCCA's opinion does not mention each mitigation-related comment he challenged. This argument fails here as well. In the opinion, the OCCA specifically noted that Petitioner's final argument was that the prosecutors "made statements during second-stage closing argument designed to diminish, denigrate, or completely invalidate the mitigating evidence that was presented." Harmon, 248 P.3d at 943. It then went on to address the claim at length. Id. at 943-44. There is no question that AEDPA deference applies.

Two of Petitioner's challenges to the unreasonableness of the OCCA's opinion are based on OCCA precedent. First, Petitioner argues that because the OCCA had previously warned prosecutors to avoid making such comments, it had already determined that the comments amounted to error, and therefore he should have been granted relief. Pet. at 71-72. In both Cuesta-Rodriguez v. State, 241 P.3d 214, 244 (Okla. Crim. App. 2010), and Hooker v. State, 887 P.2d 1351, 1367 (Okla. Crim. App. 1994), the OCCA found the "guilt trip" argument troubling; however, in neither case did the OCCA grant relief. As in Petitioner's case, the OCCA addressed the comment in light of the entire trial and found the jury's assessment of a death sentence to be unaffected. This approach is in line with Supreme Court authority, which requires an assessment of the entire proceeding to order to determine if the prosecutor's actions rendered Petitioner's trial fundamentally unfair. Donnelly, 416 U.S. at 643.

Next, Petitioner asserts that the OCCA's decision is unreasonable because the OCCA failed to equate the comments in his case to the comments found to be improper in Harris v. State, 164 P.3d 1103 (Okla. Crim. App. 2007). Harris, however, is just another example of how a prosecutor's actions must be gauged with respect to the entire trial. In Harris, as in Cuesta-Rodriguez and Hooker, the OCCA considered all of the comments made by the prosecutor about mitigation evidence, along with the instructions given the jury. Although some comments were improper, the OCCA denied relief, finding that "[t]he prosecutor's improper argument on [mitigating evidence] was cured by further argument and instruction." Harris, 164 P.3d at 1114.

Petitioner additionally asserts that the OCCA's decision is an unreasonable application of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985). In <u>Caldwell</u>, the Supreme Court found that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's sentence rests elsewhere." <u>Caldwell</u>, 472 U.S. at 328-29. In <u>Caldwell</u>, the prosecutor told the jury that its decision was not final because it would be reviewed by the Supreme Court, and the trial court openly affirmed the prosecutor's remarks before the jury. <u>Id.</u> at 325-26, 339. The Supreme Court granted relief because "the prosecutor's argument sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment . . . ." <u>Id.</u> at 340.

Contrary to Petitioner's assertion, the circumstances in his case are not as stark as those in <u>Caldwell</u>. Although the prosecutors did make some edgy remarks, they also made proper comments and permissible argument about the jury's consideration of Petitioner's mitigating circumstances. In addition, the jury's consideration of mitigation of evidence was guided by the given instructions. Instruction No. 9 defined mitigating circumstances as "1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty" (O.R. VII, 1205). Three times, the prosecution parroted this definition to the jury (Tr. VIII, 94, 96, 121-22). Instruction No. 11 listed fourteen circumstances which Petitioner put forth as mitigating evidence; however, the jury was told that it was not

confined to this list but could also consider any other circumstances it found to be mitigating (O.R. VII, 1208-10). The jury was also instructed that mitigating circumstances did not have be proven beyond a reasonable doubt and that before it could return a sentence of death, it had to find at least one aggravating circumstance beyond a reasonable doubt and that the "aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances" (O.R. VII, 1205, 1211). In conjunction with these instructions, the prosecutors told the jury that consideration of Petitioner's mitigation evidence was a part of the deliberation process, while arguing that it was the State's position that Petitioner's mitigating circumstances did not outweigh the aggravating ones (Tr. VIII, 85, 93-94, 96-97, 99, 100-01, 114, 121-22). Under these circumstances, the Court cannot deem the OCCA's determination unreasonable. Especially in light of AEDPA deference, no relief is warranted.

### Claims Raised in Post-Conviction

Petitioner raises three claims of prosecutorial misconduct from his first post-conviction application.[17] Two of these claims directly relate to Petitioner's Grounds Two and Three. Pet. at 64. Whereas Petitioner raises evidentiary challenges to the admission of evidence in his Grounds Two (his statement to Ms. Battle at the police station) and Three (Mr. Boston's testimony and 2004 interview), here Petitioner reformulates the claim as a due process challenge to the actions of the prosecutors. Petitioner has been denied relief on his Grounds Two and Three under Brecht, and the Court finds that such

---

[17] Once again, the parties dispute whether these claims are procedurally barred. Rather than analyze that issue, the Court elects to deny these claims on the merits.

analysis sufficiently covers the related claims Petitioner raises here. If the admission of the underlying evidence was harmless, then any alleged improper plan the prosecution implemented with respect to this evidence cannot be said to have denied him a fundamentally fair trial. Donnelly, 416 U.S. at 643.

Petitioner's final claim is that the prosecutor failed to properly caution one of the State's witnesses, and that due to that failure, inadmissible evidence was introduced in the second stage. A records supervisor from the Arkansas Department of Corrections testified that while Petitioner was in their custody, it was determined that he either participated in or committed a sexual assault against another inmate and that a shank had been used to perpetrate the assault. She testified that Petitioner was administratively punished for his involvement and that the victim of the assault was James Eford[18] (Tr. VI, 88-90). Mr. Eford also testified. When asked to describe the assault to the jury, Mr. Eford said that his cellmate was raped. Defense counsel objected due to lack of notice, the jury was admonished to disregard the statement, and thereafter the prosecutor led the witness and elicited testimony that Petitioner, who had a knife or shank, had attempted to sexually assault him (Tr. VII, 32-37). On cross-examination, Mr. Eford started again to discuss what happened to his cellmate, but was interrupted by defense counsel and cautioned by the trial court to carefully listen and answer only the questions asked (Tr. VII, 37-38).

---

[18] The records supervisor testified that the victim's last name was Euford, but when Mr. Eford testified, his name was spelled differently.

Petitioner argues that the prosecutor's conduct allowed Mr. Eford to testify about a prison rape and that "a prison rape is too prejudicial to be cured by an admonition." Pet. at 66. However, there is no indication that the prosecutor did anything wrong with respect to Mr. Eford. The jury was admonished to disregard the evidence which Petitioner objected to based on a lack of notice, and thereafter the prosecutor carefully led the witness to avoid any further mention of the evidence. When the witness attempted to broach the subject again on cross-examination, he was curtailed. Petitioner has not shown that he was denied a fair trial by Mr. Eford's reference to unnoticed evidence. Donnelly, 416 U.S. at 643. In addition to the other evidence supporting the jury's finding of the continuing threat aggravating circumstance, see Ground Eleven, infra, the jury already knew that Petitioner, while incarcerated in an Arkansas prison and armed with a shank, had attempted to sexually assault Mr. Eford. Relief on this claim is denied.

For the foregoing reasons, the Court finds that no relief is warranted on Petitioner's Ground Ten. Relief is therefore denied.

## K. Ground Eleven: Ineffective Assistance of Trial and Appellate Counsel.

In his eleventh ground for relief, Petitioner asserts that his trial counsel was ineffective for not presenting evidence of Mr. Lancaster's role in the commission of the crime, for not having Petitioner evaluated by a mental health professional and presenting evidence of his cognitive deficiencies and mental illness, for not presenting evidence that he was sexually abused as a child, and for not presenting "first-hand narratives of specific instances of [his] extremely chaotic childhood." Pet. at 88. Petitioner also faults his

appellate counsel for not raising these instances of trial counsel ineffectiveness on direct appeal. Petitioner raised these claims in his first post-conviction application. The OCCA concluded that Petitioner's trial counsel claims were waived and that his appellate counsel was not ineffective for failing to raise these claims on direct appeal. Harmon, No. PCD-2008-919, slip op. at 3-12, 17.

In denying Petitioner relief, the OCCA acknowledged from the start the procedural posture of the claims. Even though Petitioner's trial counsel claims were waived under the OCCA's rules, because Petitioner also argued that his appellate counsel failed him by not presenting these claims on direct appeal, it was necessary to address the merits of the trial counsel claims as well. The OCCA acknowledged that its review of Petitioner's claims was governed by Strickland v. Washington, 466 U.S. 668 (1984). Harmon, No. PCD-2008-919, slip op. at 3-5.[19]

Strickland requires a defendant to show not only that his counsel performed deficiently, but that he was prejudiced by it. Strickland, 466 U.S. at 687. A defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. The assessment of counsel's conduct is "highly deferential," and a defendant must overcome the strong presumption that counsel's actions constituted "'sound trial strategy.'" Id. at 689 (citation omitted).

_____

[19] Given this posture, rather than address the procedural bar issue, the Court elects to dispose of all of Petitioner's ineffectiveness claims on the merits. AEDPA deference applies, Smith v. Duckworth, 824 F.3d 1233, 1242 n.6 (10th Cir. 2016), and the Court's review is limited by Pinholster, 563 U.S. at 181.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690.

As Strickland cautions, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. Within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id.

As for prejudice, Strickland requires a defendant to show that his counsel's errors and omissions resulted in actual prejudice to him. Id. at 687. In order to make a threshold showing of actual prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Claims regarding the effectiveness of appellate counsel are governed by Strickland as well. Milton v. Miller, 744 F.3d 660, 669 (10th Cir. 2014) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)). In accordance with Strickland, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were

objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. Robbins, 528 U.S. at 285-86; Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting Ellis v. Hargett, 302 F.3d 1182, 1186-87 (10th Cir. 2002)).

When an appellate counsel claim concerns omitted issues, Strickland's first prong requires a showing that counsel unreasonably omitted "nonfrivolous issues." Robbins, 528 U.S. at 285. When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim. Id. at 288. Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . ." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed." Jones, 463 U.S. at 752-53.

### Lancaster as an Alternative Suspect

Petitioner's first challenge to his trial counsel's representation involves Mr. Lancaster. Petitioner faults his trial counsel for not investigating and presenting certain evidence regarding Mr. Lancaster which he believes would have made "a viable 'reasonable doubt' guilt stage defense." Pet. at 75-76. Petitioner contends that "[s]uch evidence, at a minimum, raises reasonable doubt about whether Lancaster was the shooter, provides evidence of his violent propensities and his out-of-control use of

firearms, and paints him as a dominant figure for whom witnesses are willing to lie and even recant." Id. at 79. Petitioner additionally asserts that this same evidence could have benefitted him in the second stage. Petitioner argues that if trial counsel could have shown that Mr. Lancaster was the one who actually shot Mr. Choudhury, then the jury may not have found the especially heinous, atrocious, or cruel aggravator. Petitioner also asserts that this evidence would have had other mitigating effects, including showing that he was susceptible to Mr. Lancaster's bad influence.[20] Id. at 76.

In evaluating the merits of this allegation of trial counsel ineffectiveness, the OCCA held as follows:

> [Petitioner] claims that trial counsel was constitutionally ineffective in the first stage of trial for failing to investigate and present evidence in support of the defense theory that Christopher Lancaster was responsible for the murder of the convenience store owner in this case. Lancaster was originally charged in this case along with [Petitioner] and Jasmine Battle. The case against Lancaster was dismissed after the court suppressed [Petitioner's] confession. [Petitioner] argues that trial counsel should have put on evidence of Lancaster's criminal record and evidence concerning the recovery of a 9mm semiautomatic handgun that Lancaster hid at the home of the mother of his children prior to his arrest. According to [Petitioner], evidence of Lancaster's criminal history "could have been used to bolster the defense theory" that Lancaster was involved in the robbery and murder in this case, presumably, because participating in an armed robbery and shooting would not have been out of character for Lancaster based on other crimes he committed. Evidence that Lancaster had hidden a 9 mm handgun at the home of his children's mother was important says [Petitioner] because it is possible this gun was the murder weapon since a 9 mm handgun could have been used to fire the fatal shots in this case.

---

[20] Petitioner argues that the OCCA failed to address the second stage implications of his Lancaster claim. Pet. at 91. However, the OCCA's analysis of this claim indicates otherwise: "Evidence that Lancaster may have somehow been involved does not exonerate [Petitioner] or cast doubt *about the validity of his conviction and sentence* in light of the evidence against him." Harmon, No. PCD-2008-919, slip op. at 8 (emphasis added).

[Petitioner] cannot make the necessary showing to prevail on an ineffective assistance of counsel claim because the information he has provided in this application fails to convince us that there is a reasonable probability that the outcome of his trial would have been different had the evidence been presented. The gun hidden by Lancaster was recovered and, according to the police report attached by [Petitioner], was submitted for a ballistics examination. <u>See</u> Attachment 10. [Petitioner] wants us to speculate here that this gun has some connection to the instant case, but provides no evidence that the gun was used in this case nor does he argue that this possible murder weapon was used solely by Lancaster in an effort to show that he was not the shooter.

[Petitioner's] presence at the crime scene and involvement in the murder were amply established by: 1) his palm print in blood on a piece of paper behind the store counter; 2) the identification by an eyewitness of [Petitioner] as the man seen running from the store with a gun immediately before the bleeding victim emerged and collapsed; 3) the testimony of an accomplice that she drove [Petitioner] to commit the robbery, heard gunshots, and saw blood on [Petitioner's] hands when he returned to the car; 4) evidence that [Petitioner] used the victim's stolen credit cards within fifteen minutes of the robbery as well as several other times over the next day; and 5) evidence [Petitioner] had told an associate that he had to "plug" a man. Evidence that Lancaster may have somehow been involved does not exonerate [Petitioner] or cast doubt about the validity of his conviction and sentence in light of the evidence against him. [Petitioner] has not shown ineffective assistance of trial counsel on this record.

<u>Harmon</u>, No. PCD-2008-919, slip op. at 6-8 (footnotes omitted).

Although Petitioner asserts that the OCCA's decision is both legally and factually unreasonable, the Court disagrees. There is no evidence that the OCCA "ignored critical facts and unreasonably relied on other 'facts' for improper purposes." Pet. at 91. The evidence Petitioner asserts trial counsel should have presented about Mr. Lancaster is nothing more than guilt by association evidence and it is so far afield from even a circumstantial showing that Mr. Lancaster might have been involved that it lacks any evidentiary value at all. Moreover, the clear and undisputed evidence at trial was that

only one male was involved in the crime.[21]  Ms. Battle testified that she had only one

accomplice and that one accomplice was Petitioner (Tr. IV, 183-86, 189-93).  Ms. Ashley

saw one man run out of the store with a gun in his hand and that one man was

Petitioner (Tr. III, 158-59, 176-80, 191-93; State's Ex. 18).  Neighbors saw only one man

before and only one man after get into Petitioner's girlfriend's green Honda with

Ms. Battle and drive away (Tr. III, 199-203, 211-22; Tr. IV, 38-44, 50-63).  And

validating all of this evidence was the unchallenged evidence of Petitioner's palm print at

the scene (Tr. IV, 122-27, 154-60; State's Exs. 42-44).  Thus, it was completely

reasonable for the OCCA to conclude that "[e]vidence that Lancaster may have somehow

been involved does not exonerate [Petitioner] or cast doubt about the validity of his

conviction and sentence in light of the evidence against him."  Harmon, No. PCD-2008-

919, slip op. at 8.

## Second Stage Claims

Petitioner's remaining claims concern the second stage defense presented by trial

counsel.  As is often the case, Petitioner asserts that his trial counsel should have done

more.  Before addressing these claims, it is necessary to summarize the second stage

evidence presented by both the State and the defense.

### The State's Second Stage Evidence

The State alleged three aggravating circumstances: (1) the murder was especially

heinous, atrocious, or cruel; (2) Petitioner committed the murder while serving a sentence

---

[21] Although Petitioner faults the OCCA for considering his "plug one" statement to Mr. Boston as substantive evidence of his guilt, see Ground Three, supra, it is of no consequence.  Even without consideration of this evidence, the evidence of Petitioner's guilt was overwhelming.

of imprisonment on conviction of a felony; and (3) the existence of a probability that Petitioner will commit criminal acts of violence that would constitute a continuing threat to society (O.R. I, 121-22). In support of these aggravators, the State incorporated the evidence from the first stage and presented twenty witnesses.

Shelly Maroney, a records supervisor from the Arkansas Department of Corrections, testified about Petitioner's Arkansas convictions. Petitioner had ten Arkansas convictions in total, eight from 1997[22] and two from 2000. Six were for residential burglary and four were for theft of property. For his 1997 convictions, Petitioner received a seven-year concurrent sentence, and for his 2000 crimes, Petitioner received a ten-year concurrent sentence. However, the seven-year sentence and the ten-year sentence were ordered to be served consecutively. Petitioner was in prison for these crimes until his release on parole on January 3, 2003. Petitioner reported to his parole officer until July 14, 2003. When he failed to report after that, a warrant was issued for his arrest (Tr. VI, 80-88).

Ms. Maroney also testified that while Petitioner was in the custody of the Arkansas Department of Corrections, he received a misconduct for his involvement in a sexual assault committed against Mr. Eford (Tr. VI, 88-90). Mr. Eford also testified regarding this assault which took place in March 1998. He confirmed that Petitioner, armed with a knife or a shank, had attempted to sexually assault him (Tr. VII, 33, 36-37).

The State presented evidence that Petitioner had been involved in four Oklahoma City armed robberies in 2004. On January 5, 2004, Petitioner (with one accomplice)

_____

[22] Petitioner was under the age of eighteen when these crimes were committed (Tr. VI, 90-91).

robbed Frank Evangelisti at gunpoint at his place of business, Snows Liquor (Tr. VI, 125-29).  On April 21, 2004, Petitioner (with three accomplices) robbed Scott Nevez at his place of business, Sam's Wholesale Liquor.  Mr. Nevez gave an especially harrowing account of how Petitioner put a revolver to his forehead as he demanded money (Tr. VI, 141-47; Tr. VII, 23-25).  On July 21, 2004, Petitioner (with two accomplices) robbed Judy Coke at gunpoint at a neighborhood convenience store where she had just purchased some cokes on her way home from work (Tr. VI, 97-110, 120-22).  On August 26, 2004, just nine days after Mr. Choudhury's murder, Petitioner (with one accomplice) robbed Charlene Worley and Connie Pedigrew, employees of the Family Dollar Store, at gunpoint.  Petitioner's prints were found on a package of toilet paper he brought to the checkout counter before demanding money (Tr. VI, 150-59; Tr. VII, 9-10, 12-16, 19-21).

The State also presented evidence that while awaiting trial Petitioner stabbed a fellow inmate, Roger Harris. Mr. Harris testified that he and Petitioner got into a fight in December 2007, and that Petitioner used a shank to stab him in the chest.  Petitioner was apparently mad at Mr. Harris because he flooded his cell and Petitioner, who worked as an orderly, had to clean it up (Tr. VII, 41-56, 57-61, 63-68; State's Exs. 60, 61, and 63).  The State's final witnesses were Mr. Choudhury's wife and son. Both gave brief statements (Tr. VII, 72-75).

## Petitioner's Second Stage Evidence

Four of the nine witnesses who testified on behalf of Petitioner were family members.  Petitioner's cousin, Jason Murphy, testified that he and Petitioner grew up together and that Petitioner had a tough home life.  Mr. Murphy told the jury that

Petitioner's mother used drugs and was not really there for him. Because of her, Petitioner saw things "a small kid shouldn't see[,]" including domestic abuse. Petitioner spent many nights away from home in an attempt to avoid his unstable home environment. Mr. Murphy testified that Petitioner attended school about half of the time. When Petitioner was released from prison, Mr. Murphy tried to help him. Petitioner moved in with him, and Mr. Murphy continually encouraged Petitioner to get a job and quit hanging around with the wrong crowd. Mr. Murphy testified that he contacted the police when he learned of Petitioner's involvement in Mr. Choudhury's death. Mr. Murphy kept in contact with Petitioner while he was in jail. Petitioner regretted not taking Mr. Murphy's advice. Mr. Murphy asked the jury to spare Petitioner's life (Tr. VII, 77-85, 90-91). On cross-examination, Mr. Murphy admitted that although he and Petitioner had similar backgrounds, he, unlike Petitioner, went to school, got a job, and was successful (Tr. VII, 88).

John Bromsey, Petitioner's uncle, testified that he looked after Petitioner. Mr. Bromsey testified that Petitioner often got kicked out of the house for defending his mother from his stepfather's abuse. When Petitioner stayed with him, which was often, Mr. Bromsey made sure Petitioner did his school work. Mr. Bromsey acknowledged his sister's drug habit, which was present even before Petitioner was born. Mr. Bromsey testified that because Petitioner's siblings were dealing with the same issues Petitioner did as growing up, he now took care of them. Mr. Bromsey, who had his own issues with drugs, was at one time incarcerated at the same facility as Petitioner. While in prison, Mr. Bromsey told Petitioner that when he was released, he should stay at his house and

look after his siblings. Mr. Bromsey told him to "turn the lights on and stay out of trouble." Petitioner did not follow his advice. Mr. Bromsey asked the jury to spare Petitioner's life. He said that he would write and visit Petitioner (Tr. VII, 93-101).

Petitioner's aunt, Janice Williams, testified that she and her family raised Petitioner from a baby. From about age one to four or five, Petitioner was often in their care. Ms. Williams told the jury that her father, Petitioner's grandfather, had wanted to adopt Petitioner, but Petitioner's mother would not let him. When Petitioner was a teenager, a question arose as to whether her brother was actually Petitioner's father, but that did not change the way they felt about him. Ms. Williams testified that Petitioner had a great relationship with her father and that when Petitioner was with them, he was never in any trouble. Ms. Williams testified that she maintained contact with Petitioner and she asked the jury to spare his life (Tr. VII, 116-24). On cross-examination, Ms. Williams told the jury that when Petitioner first got into trouble at the age of fourteen, she tried to help him get back on track. She admitted that his struggles had been heartbreaking to her family (Tr. VII, 127-28, 132).

Petitioner's little sister, JaQuinda Sims, who was only thirteen at the time of trial, also testified. She testified that she did not live with her parents, but with relatives, as did her brothers. She identified family pictures, which were introduced into evidence. She told the jury that she had written letters to Petitioner for a long time. Five of those letters were admitted into evidence. She and Petitioner had a special relationship. She said she would write him forever (Tr. VII, 175-80; Def.'s Exs. 8-12).

Petitioner fathered a child when he was only fourteen years old. His daughter, Trynecka, was twelve years old at the time of trial (Tr. VI, 90; Tr. VII, 155). His daughter's mother, Danielle Sheffey, and grandmother, Loretta Sheffey, both testified. Loretta Sheffey testified that when she met Petitioner "he was pretty much on his own." Petitioner stayed at her house two to three times a week (Tr. VII, 135). Ms. Sheffey grew to love Petitioner as one of her own. Petitioner wanted her to adopt him, but she was not in a position to do so. Ms. Sheffey testified that she still loved Petitioner and she asked the jury to spare his life (Tr. VII, 136-38, 141). Danielle Sheffey gave more details about her relationship with Petitioner and Petitioner's relationship with their daughter. She testified that their daughter is deaf, and even though Petitioner's contact with her has been sporadic, she knows who her father is and she loves him. She asked the jury to spare Petitioner's life for their daughter's sake (Tr. VII, 155, 158, 160).

Devonna Bolden, Petitioner's girlfriend at the time of the crime, testified about her relationship with Petitioner. Ms. Bolden, who has lupus, told the jury that Petitioner took good care of her when they were dating. She also testified that when she got pregnant with his child and had a miscarriage, Petitioner was helpful in every way. Ms. Bolden had spent time with Petitioner and his daughter. She said Petitioner and his daughter were very close and that Petitioner had learned sign language in order communicate with her. Although their relationship ended when Petitioner went to jail, she testified that she still had feelings for him (Tr. VIII, 53-59).

Nathaniel Thurman, an ordained minister, testified that he had been visiting with Petitioner in the county jail two to three times a month for the last three to four years. He

testified that he and Petitioner had had some fairly in-depth conversations and that Petitioner had a strong faith. He described Petitioner as intelligent and articulate and said Petitioner was good at writing poems[23] and drawing. Pastor Thurman told the jury that he would visit him in prison if the jury spared Petitioner's life (Tr. VIII, 66-69).

Licensed clinical social worker Selonda Moseley compiled a social history of Petitioner's life and discussed her findings with the jury (Tr. VII, 182-83).[24] She testified that she interviewed Petitioner's family members and reviewed all of his records. She told the jury that the purpose of a social history is "not to . . . explain away a person's behavior," but "to understand why someone thought or behaved certain ways or why they interacted with their environment the way they did" (Tr. VII, 183-86). Ms. Moseley testified extensively about Petitioner's upbringing, using a governmental study which evaluates risk and protective factors in five categories–individual, family, school, peers, and community (Tr. VII, 187-90). Ms. Moseley concluded that Petitioner had multiple risk factors and less protective factors across all categories. In the individual category, he had eight out of ten risk factors and none of the seven protective factors (Tr. VII,192-95); in the family category, he had all of the risk factors and one of four protective factors (Tr. VII, 195-97, 199-206, 208-09); in the school category, he had all of the risk factors and no protective factors (Tr. VII, 207-10); in the peer category, he had two of three risk factors and one of three protective factors (Tr. VII, 210-11); and in the

_____

[23] One of Petitioner's poems was admitted into evidence (Tr. VII, 179; Def.'s Ex. 13).

[24] A copy of her report, which was referred to multiple times by the prosecutor on cross-examination, was included as Attachment 14 in Petitioner's Original Application for Post-Conviction Relief.

community category, he had six of nine risk factors and all of the protective factors (Tr. VII, 211-14).

Ms. Moseley gave additional testimony about Petitioner's mother, who was only fifteen when she gave birth to him (Tr. VII, 216). Petitioner was a crack baby, whose mother would express her breast milk rather than feed him (Tr. VII, 216-17; Tr. VIII, 11-12). Ms. Moseley testified that "because of his mother's depression, her substance abuse and her [violent] relationship with her husband, all of those factors interfered with her being a positive role model for [Petitioner] and being able to attend to his needs" (Tr. VII, 214). His mother's issues often caused a reversal in their roles, i.e., Petitioner would come home and find his mother so high that he would have to take care of her (Tr. VII, 215). Ms. Moseley also testified about the issue of Petitioner's paternity and the affect that had on him (Tr. VIII, 6-10).

Finally, Ms. Moseley testified about Petitioner's future. She testified that although she was aware of those instances when Petitioner got into trouble while incarcerated, she also recognized his ability to excel while confined and felt that he could be productive in prison (Tr. VIII, 12-14).

Based on the presented evidence, the jury was given the following list of circumstances Petitioner believed to mitigate his sentence:

1.      [Petitioner] was born to a drug addicted mother, who dumped her breast milk rather than feed it to [him].

2.      It is unknown who is truly [Petitioner's] father; and [Petitioner] has grown up with this question being asked his entire life.

3.     Melvin Harmon has denied [Petitioner's] parentage and refused to put his name on the birth certificate.

4.     Arberry Bromsey raped [Petitioner's] mother, Julia Brown Sims, when she was a child.  He then carried on an extra-marital relationship with her in her teens.  It was during this period of time that [Petitioner] was conceived.

5.     [Petitioner] did not have a safe, stable home in which to live.  As a child he lived from place to place; sometimes in the woods or on a porch.

6.     [Petitioner's] grandfather, Melvin Harmon, Sr., loved and wanted [Petitioner].  His family treated [Petitioner] well.  When Melvin Harmon, Sr. died it was a great loss to [Petitioner].

7.     [Petitioner] lived for a period of time with Danielle Sheffey and her mother, Loretta Sheffey.  He and Loretta Sheffey formed a bond and [Petitioner] asked her to adopt him.

8.     [Petitioner] and Danielle Sheffey were fourteen years old when their daughter, Trynecka, was born.  Trynecka is deaf.

9.     [Petitioner] has learned the basics of sign language so that he can communicate with Trynecka.  She and [Petitioner] love one another.

10.    [Petitioner] has a sister, JaQuinda Sims, as well as two younger brothers; Raylan and Marcus.  All three of these siblings are having problems.  They will need the guidance of their older brother.

11.    JaQuinda Sims was raped when she was 9 years old.  [Petitioner] was not there for her, despite his Uncle John's advice that he stay and take care of her.  [Petitioner] and JaQuinda have a relationship through letters.  They love one another.

12.    Devonna Bolden is a former girlfriend of [Petitioner's].  During the time they were together he treated her kindly.  She has lupus.  When Devonna Bolden became pregnant with [Petitioner's] child they were very happy.  [Petitioner] took her to medical appointments.  When Devonna Bolden miscarried, both she and [Petitioner] were greatly saddened.

13.      [Petitioner] has had the counsel and advice of a minister, Nathaniel Thurman, for several years. He believes [Petitioner's] faith is genuine.

14.      [Petitioner] has family members who love him and do not wish him to be sentenced to death.

(O.R. VII, 1208-10).

## Additional Available Evidence

Petitioner asserts that had his trial counsel had him evaluated by a mental health professional, they would have discovered neurological impairments, mental illness, and child abuse. Petitioner also claims that trial counsel should have presented more family witnesses to give more first-hand, graphic detail about his upbringing. Petitioner argues that "[t]rial counsel made an unreasonable decision to pull the investigation up short when significant additional trauma suffered by [him] was easily attainable and when a thorough investigation would have turned up crucial mitigating evidence of [his] mental impairments and cognitive deficits." Pet. at 80-81. Petitioner states that his "[t]rial counsel never consulted or retained a qualified mental health professional." Id. at 81.[25] Petitioner also argues that Ms. Moseley's testimony was not enough because "[s]he offered nothing to explain [his] behavior." He additionally contends that because Ms. Moseley referenced his antisocial behaviors, she actually aided the State's aggravation case. Id. at 82.

---

[25] Petitioner offers no support for this contention, and Respondent aptly notes that although Petitioner presented an affidavit on post-conviction from one of his trial attorneys, the affidavit contains no information about the mitigation investigation. Resp. at 102. Counsel makes no statement that she did not consult or retain a qualified mental health professional. *Original Appl. for Post-Conviction Relief* at Attach. 26. Additional trial counsel affidavits are silent on this issue as well. Pet'r's Exs. 15 and 16.

The record reflects that at the urging of his post-conviction counsel, Petitioner had a neuropsychological evaluation. As for Petitioner's cognitive abilities, Dr. Antoinette R. McGarrahan found that Petitioner "has average intellectual abilities and generally commensurate neurocognitive functioning across numerous domains assessed." She also found that Petitioner's brain function shows "a pattern of strength and weaknesses." *Original Appl. for Post-Conviction Relief* at Attach. 13, Ex. 2, pp. 14-15. Petitioner's weaknesses include "simple and complex verbal memory, complex visual memory, and problem solving and planning skills." Id. at 15. Dr. McGarrahan's diagnostic impressions were that Petitioner "suffers from depression, anxiety, symptoms of posttraumatic stress disorder, borderline personality traits, substance abuse, and antisocial personality disorder." Id.

The OCCA considered Dr. McGarrahan's report and concluded that Petitioner's trial counsel were not ineffective in their presentation of the second stage case. Given the evidence that was presented, the OCCA concluded that "the information Dr. McGarrahan or a similar expert could have added would [not] have made a difference in the outcome of [the] case." Harmon, No. PCD-2008-919, slip op. at 10. Regarding the sexual abuse evidence, the OCCA found this claim to be unsupported and it denied relief on that basis. Id. at 11-12. The OCCA also found that trial counsel was not ineffective for failing to present additional family witnesses because their actions were "within the wide range of reasonable professional assistance and . . . [Petitioner had] failed to overcome the presumption that the challenged action 'might be considered sound trial

strategy.'' Id. at 11. Petitioner makes several assertions as to why these determinations by the OCCA are both factually and legally unreasonable. Pet. at 91-92.

First, Petitioner argues that the OCCA misconstrued his claim. With reference to a few sentences in the OCCA's detailed analysis, Petitioner asserts that the OCCA construed his claim as faulting trial counsel for not fully evaluating the mental health issues of his mother and family, when his actual claim was his own mental health. Pet. at 91-92. A review of the OCCA's complete analysis of this issue shows that the OCCA both understood and addressed the claim Petitioner raised and that its references to the mental impairments of Petitioner's mother and family were clearly in response to arguments contained in his application that "Dr. McGarrahan could have also used [his] family's mental health history combined with studies that demonstrate mental illness is often passed down through a family." *Original Appl. for Post-Conviction Relief* at 13-14.

Next, Petitioner asserts that the OCCA used the wrong prejudice standard. With reference to the OCCA's statement that the evidence would not have made a "difference in the outcome," Petitioner argues that the OCCA applied a prejudice test contrary to Strickland's reasonable probability standard. Pet. at 92. While the OCCA did not parrot the Strickland standard in this particular sentence, it is abundantly clear that the OCCA applied the Strickland standard to evaluate all of Petitioner's ineffectiveness claims. Harmon, No. PCD-2008-919, slip op. at 3-5, 10. Therefore, this assertion is without merit.

Petitioner's third and fourth challenges to the OCCA's decision are nothing more than threadbare declarations that it was unreasonable for the OCCA to deny him relief on

his claims related to the presentation of additional family witnesses and his assertion that he was sexually abused as a child. Pet. at 92. The lack of any argument or authority here is reason enough to deny these contentions. But beyond that, the Court finds that given the evidence that trial counsel did present about Petitioner's upbringing, it was not unreasonable for the OCCA to find that trial counsel were not ineffective for failing to present more of the same. As for the child sexual abuse, the OCCA denied relief on this claim because Petitioner failed to make a showing that he had in fact been sexually abused. The OCCA noted that the only evidence Petitioner had provided to support the claim was "an affidavit from his grandmother of *her suspicions* that [he] was sexually abused by a teenage neighbor when [he] was six or seven years old." Harmon, No. PCD-2008-919, slip op. at 11 (emphasis added). Contrary to Petitioner's assertion, this is a reasonable basis for denying the claim.

Finally,[26] Petitioner makes the general assertion that "[t]he OCCA never undertook the kind of probing and fact-specific analysis Strickland requires." Pet. at 92. This is completely without merit. A review of the OCCA's opinion shows that it gave detailed analysis of all of Petitioner's ineffectiveness claims, and the Court agrees with its assessment. Harmon, No. PCD-2008-919, slip op. at 8-17. There is no doubt that Petitioner had a tragic upbringing and that it influenced his criminal activity. The evidence which trial counsel presented painted this picture for the jury, and like the

---

[26] The Court notes that Petitioner makes an additional argument for unreasonableness based on the OCCA's determination of a claim regarding the unruly behavior of his siblings. Pet. at 92. Although Petitioner raised that additional claim in post-conviction, he has not raised it here. Thus, challenging the unreasonableness of that ruling is of no consequence.

OCCA, the Court cannot conclude that the additional evidence Petitioner has brought forth would have, within a reasonable probability, caused a different result. Not only was the felony murder case against Petitioner overwhelming, but the circumstances of the crime and Petitioner's very life history weighed heavily in favor of a death sentence. Petitioner was on parole when he killed Mr. Choudhury, and it was clear that Mr. Choudhury's death was especially heinous, atrocious, or cruel. But even more difficult for Petitioner to overcome was the continuing threat aggravator, which was just as easily satisfied. In addition to a criminal history which began in his teen years, Petitioner committed three armed robberies in 2004, not including the robbery in this case, and even more disturbing and detrimental to his mitigation case was his final robbery, committed *a mere nine days* after killing Mr. Choudhury. The jury no doubt took note that Petitioner's criminal conduct was not hampered by Mr. Choudhury's murder. And while Petitioner's evidence attempts to soften the blow of his antisocial behaviors, the fact remains that he has them. Ms. Moseley referenced them,[27] and Dr. McGarrahan confirmed them.[28] They have been evident since he was a teenager, and

---

[27] Although Petitioner faults Ms. Moseley for giving this damaging testimony and trial counsel for sponsoring it, the Court notes that her testimony on this issue consisted of minor references only (Tr. VII, 192-94). So minor, in fact, that the prosecutor did not even mention it on cross-examination or make any reference to it in closing argument.

[28] Dr. McGarrahan, the mental health expert Petitioner asserts his trial counsel should have retained, unequivocally diagnosed Petitioner with antisocial personality disorder. Had she testified consistent with her evaluation, it would not have helped Petitioner's mitigation case. Without a doubt, the prosecution would have emphasized the damaging ramifications of such a diagnosis. See Wilson v. Trammell, 706 F.3d 1286, 1305 (10th Cir. 2013) ("To resolve whether there was prejudice, we do not consider omitted mitigation evidence in a vacuum."); Stafford v. Saffle, 34 F.3d 1557, 1565 (10th Cir. 1994) (acknowledging that antisocial behavior plays into the jury's assessment of the continuing threat aggravating circumstance).

Petitioner makes no assertion that his antisocial behaviors can be treated or controlled. Contra Littlejohn v. Trammell, 704 F.3d 817, 865 (10th Cir. 2013) (acknowledging that a treatable mental health condition is powerful mitigating evidence that a defendant is not a continuing threat). Under these circumstances, it was not unreasonable for the OCCA to conclude that trial counsel were not ineffective for the failings Petitioner alleged.

### Appellate Counsel Ineffectiveness

After examining the merits of all of Petitioner's trial counsel claims, the OCCA went on to find that appellate counsel was ineffective either:

> [Petitioner] has not shown that trial counsel was ineffective; therefore, he cannot show that appellate counsel was ineffective for failing to raise these instances of ineffective assistance of trial counsel. The majority of the evidence at issue here was discovered and presented by trial counsel to [Petitioner's] jury. [Petitioner] has not shown a reasonable likelihood that the outcome of his case would have been different had trial counsel presented the omitted evidence about Lancaster in the first stage of trial or presented the second stage case in mitigation differently with additional evidence. Nor has he shown a reasonable likelihood that the outcome of his appeal would have been different had appellate counsel raised these instances of alleged ineffective assistance of trial counsel. This claim is denied.

Harmon, No. PCD-2008-919, slip op. at 17. Given its reasonable analysis of Petitioner's trial counsel claims, this determination is likewise reasonable. Therefore, for all the reasons set forth herein, Petitioner's Ground Eleven is hereby denied as none of his ineffective claims have merit.

**L. Ground Twelve: Cumulative Error.**

In Ground Twelve, Petitioner argues that he is entitled to relief on the theory of cumulative error.[29] "In some circumstances, trial errors might in isolation be insignificant, but collectively be serious enough to deprive the defendant of fundamental fairness. When that happens, the defendant may obtain relief on the basis of cumulative error." Hancock v. Trammell, 798 F.3d 1002, 1025 (10th Cir. 2015).[30] Such is not the case here. While Petitioner may not have received a perfect trial, given the overwhelming evidence supporting both his conviction and sentence, the Court concludes that he is not entitled to relief for any error, individually or cumulatively. Ground Twelve is denied.

## V. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery as well as a motion for an evidentiary hearing. Docs. 29 and 37. In order to conduct discovery, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires petitioner to show good cause. In Bracy v. Gramley, 520 U.S. 899, 908-09 (1997), the Supreme Court acknowledged that "good cause" requires a pleading of specific allegations showing a petitioner's entitlement to relief if the facts are fully developed. As for an evidentiary hearing, its "purpose . . . is to resolve conflicting evidence." Anderson v. Attorney

---

[29] On direct appeal and in his both of his post-conviction applications, Petitioner alleged that he was entitled to relief on a cumulative error theory. The OCCA thrice denied this claim. Harmon, No. PCD-2014-71, slip op. at 5; Harmon, No. PCD-2008-919, slip op. at 22; Harmon, 248 P.3d at 946-47.

[30] The Tenth Circuit has recently acknowledged its "murky" position "on 'whether the need to conduct a cumulative-error analysis is clearly established federal law' for AEDPA purposes . . . ." Eizember, 803 F.3d at 1148 n.8 (quoting Hooks v. Workman, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012)).

General of Kansas, 425 F.3d 853, 860 (10th Cir. 2005). However, if there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. Id. at 859. Petitioner has not shown good cause to warrant discovery, and the Court finds that an evidentiary hearing is unnecessary because all of Petitioner's claims can be determined on the existing record. Accordingly, both motions are denied.

## VI. Conclusion.

Having rejected all of Petitioner's grounds for relief, his Petition for Writ of Habeas Corpus is **DENIED**, along with his requests for discovery and an evidentiary hearing. Docs. 27, 29 and 37. Judgment will enter accordingly.

IT IS SO ORDERED this 14th day of November, 2016.

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE